PUBLISH

**June 2, 2011**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EDWARD J. KERBER; NELSON B.
PHELPS; JOANNE WEST; NANCY
A. MEISTER; THOMAS J.
INGEMANN, JR.; MARTHA A.
LENSINK; SAMUEL G. STRIZICH,
individually, and as representative of
plan participants and plan
beneficiaries of the Qwest Group Life
Insurance Plan,

      Plaintiffs - Appellants,

v.

QWEST GROUP LIFE INSURANCE
PLAN; QWEST EMPLOYEES
BENEFIT COMMITTEE; QWEST
PLAN DESIGN COMMITTEE;
QWEST COMMUNICATIONS
INTERNATIONAL, INC.,

      Defendants - Appellees.

No. 10-1349

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:07-CV-00644-WDM-KLM)**

---

Curtis L. Kennedy, Denver, CO for Plaintiffs-Appellants.

Christopher J. Koenigs (and Michael B. Carroll with him, on the brief), Sherman
& Howard, LLC, Denver, CO for Defendants-Appellees.

---

Before **KELLY**, **MCKAY**, and **MATHESON**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

This is an appeal from several orders of the district court dismissing Plaintiffs-Appellants' claims or granting summary judgment to Defendants-Appellees. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

Background

A.     The Parties.

The Plaintiffs in this action are six participants in and two beneficiaries of a life insurance plan (the "Plan") offered by Qwest Communications International. Aplt. Br. 1.[1] All parties agree that the Plan is an employee welfare benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA") § 3(1), 29 U.S.C. § 1002(1). See id. at 6. We refer to all Defendants and predecessor companies collectively as "Qwest."

The Plan provides, inter alia, life insurance benefits to certain classes of former Qwest employees. Plaintiffs Edward Kerber and Nelson Phelps retired in

---

[1] Plaintiffs' Amended Complaint clearly refers to Mr. Strizich as a beneficiary of the Plan. See 1 Aplt. App. 35. However, the opening brief refers to Mr. Strizich as a plan participant. See Aplt. Br. 1. We assume the complaint is correct, but given our disposition, his status as a beneficiary or a plan participant is irrelevant.

February 1990, and are classified for purposes of the Plan as "Pre-1991 Retirees." 1 Aplt. App. 32-33. Plaintiff Samuel Strizich is the surviving spouse of Sharon Strizich, a Pre-1991 Retiree who died on March 20, 2007. Id. at 35. Mr. Strizich received a $10,000 life insurance benefit upon the death of his wife. Id.; see Kerber v. Qwest Group Life Ins. Plan, 656 F. Supp. 2d 1279, 1282 n.3 (D. Colo. 2009). Plaintiffs Joanne West, Nancy Meister, and Thomas Ingemann, Jr. are considered "Post-1990 Retirees," and Plaintiff Martha Lensink is the surviving spouse of Joseph Lensink, a Post-1990 Retiree who retired in 1997 and died on January 5, 2006. 1 Aplt. App. at 33-34. Ms. Lensink received a life insurance benefit of $10,000 upon her husband's death. Id. at 34. Plaintiffs brought this case as a class-action, but the district court denied class certification. 12 Aplt. App. 2588. This appeal presents no class-action issues.

This case centers around two actions taken by Qwest: (1) a retirement option (the "5+5 Option") offered to employees in 1989, and (2) amendments to the Plan that occurred between 1997 and 2007. The retirement option forms the basis for the Pre-1991 Retirees' claims for equitable estoppel and material misrepresentation, while the amendments form the bases for claims by all Plaintiffs. The operative facts of the case, though somewhat lengthy, are largely undisputed.

B.    The 5+5 Retirement Option.

In December 1989, Qwest offered an early retirement program, the 5+5

Option. 5 Aplt. App. 968. Qwest sent a packet of materials summarizing the benefits available under the 5+5 Option to eligible retirees, including Plaintiffs Kerber and Phelps. Id.; see 9 Aplt. App. 1775-1808. Those materials stated that employees who accepted the 5+5 Option would be entitled to life insurance benefits under the Plan and briefly described those benefits. 9 Aplt. App. 1784, 1798. However, the materials clearly stated, "While the plans listed below are the plans currently provided to eligible employees upon retirement, the Company reserves the right to amend or terminate any or all provisions in the future for any reason." Id. at 1797.

In response to questions about the 5+5 Option, Qwest conducted a video conference that contained the following colloquy:

> **Moderator:** . . . There is a statement in some of the paperwork that people received in their packets that's raised some questions, and that is the statement that says the company reserves the right to change benefits. There are some people worried about that. Can you speak to that statement?
>
> **Human Resource Director Charlie Kamen:** Sure. That's a typical reservation of rights statement that appears in virtually every employee benefit plan, not just [Qwest] benefit plans, but all companies' benefit plans. It is not intended to be divisive, it is not intended to be a below the board type of thing. What it is intended to do though, is it's intended to give the company the ability to modify the plans as circumstances and conditions change in the future. It's really intended to make the plans more meaningful not only for the employees but for the company.
>
> See Kerber, 656 F. Supp. 2d at 1279.

Plaintiffs Kerber and Phelps voluntarily retired under the 5+5 Option, as did

-4-

Sharon Strizich.  Id. at 1282 & n.3.

On March 26, 1990, Qwest sent confirmation letters to employees who retired under the 5+5 Option.  5 Aplt. App. 968.  The letters indicated that retirees were entitled to receive life insurance benefits under the Plan.  See 3 Aplt. App. 500-01.  However, the letters did not purport to describe the details of those benefits.  See id.

C.     The 1998 Plan Documents.

Before 1997, the Plan established a formula whereby life insurance proceeds remained constant until the retiree reached the age of 66, and then decreased over a number of years until it reached 50% of the original amount (the "Reduction Formula").  See 5 Aplt. App. 967-68 (describing the Reduction Formula); 3 Aplt. App. 624-25 (Formula as embodied in 1998 Plan).  In 1997, the Plan was amended to include a "Minimum Benefits Provision."  See 5 Aplt. App. 968; 3 Aplt. App. 624-25 (minimum benefits provision in the 1998 Plan Documents); Kerber, 656 F. Supp. 2d at 1283.  The governing documents incorporating the Minimum Benefits Provision were issued in June 1998 (the "1998 Plan Documents").

The Minimum Benefits Provision is the final sentence in subsection 2.6(a) of Article II of the Plan and provides,

> 2.6     Benefits for Eligible Retirees.  An Eligible Retiree shall commence participation in the Plan on the first day of the month coinciding with or next following the date on which such former Employee becomes eligible to receive a pension or disability benefit from the [Qwest] Pension Plan.

(a)    Basic Life Coverage.    On the first day of the month coinciding with or next following the date upon which an Eligible Retiree attains age 66, the amount of Basic Life Coverage in effect at retirement shall be reduced annually by 10 percent until the last day of the month in which an Eligible Retiree attains age 70, at which time, such Eligible Retiree's Basic Life Coverage shall remain at 50 percent of the Basic Life Coverage amount in effect prior to his 66th birthday.  Notwithstanding the foregoing, . . . such Basic Life Coverage amounts shall not be reduced below certain minimum amounts set forth in Appendix 7 . . . .

3 Aplt. App. 624-25 (emphasis added).

Appendix 7, in turn, establishes a minimum benefit of $20,000 for retirees who retired before January 1, 1996, and died after December 31, 1996, and a minimum benefit of $30,000 for retirees who retired after January 1, 1996.  Id. at 647.

The 1998 Plan Documents also contain a clause describing the company's ability to amend the Plan (the "Reservation of Rights Clause" or "ROR").  Id. at 638.  The Reservation of Rights Clause is contained in Article X of the Plan and provides,

Amendment.  Except to the extent limited by any applicable collective bargaining agreement, the Company reserves the right, in its sole discretion, to amend the Plan at any time, in any manner, including, without limitation, the right to amend the Plan to reduce, change, eliminate, or modify the type or amount of Benefits provided to any class of Participants. . . . Any such amendment of the Plan shall be effective on such date as the Plan Sponsor may determine; provided, however, that no amendment shall reduce the benefits of any Participant with respect to a loss incurred prior to the date such amendment is adopted.

-6-

Id. (emphasis added).

The last line of the ROR prohibits retroactive application of amendments that reduce benefits. Id. We refer to this provision as the "Prior Loss Proviso."

At various times between 1998 and 2004, Qwest sent to plan participants letters confirming that they were eligible for life insurance coverage. 5 Aplt. App. 969; 4 Aplt. App. 688 (2001), 690 (2002), 693 (2003), 695 (2004). Specifically, Confirmation Statements sent between 2001 and 2004 confirmed that the plan participants were eligible for life insurance coverage. Those statements also provided, "The Company intends to continue these plans indefinitely; however, it reserves the right to amend, suspend, or discontinue them at any time, except for those who retired before 1991 and where prohibited by collective bargaining agreements." 4 Aplt. App. 689 (2001), 692 (2002), 694 (2003), 696 (2004). The Confirmation Statements also indicated that the Plan Documents would govern in the event of a discrepancy between the two. Id.

D.    Amendments to the Plan and Subsequent Actions.

The parties do not dispute that the power to amend the Plan lies with a group of Qwest employees designated as the Plan Design Committee (the "PDC"). In October 2005, the PDC convened to discuss amending the Plan, specifically reducing the life insurance benefit for Post-1990 Occupational Retirees. See 5 Aplt. App. 905. There is some confusion over exactly what action the PDC took

that day. A document entitled "Plan Design Committee, Minutes and Resolutions October 14, 2005" and signed by the members of the PDC provides in relevant part,

> **Recommendation:** That the Director, Employee Benefits, Health Life & Disability, Human Resources, or his delegate, be authorized to take all actions appropriate to implement for the 2006 plan year:
>
> - Change the benefit available under the Qwest Group Life Insurance Plan with respect to occupational employees upon retirement effective January 1, 2006:
>
>   - The Basic Life Insurance Benefit is reduced to a fixed $10,000 benefit.
>
> - Change the Basic Life Insurance Benefit for Post-1990 Occupational Retirees to reduce it to a fixed $10,000 benefit effective January 1, 2006.
>
> Id.

That same document states, above the signature line,

> RESOLVED, that the Qwest Group Life Insurance Plan be and hereby is amended and restated to incorporate the design changes approved.

5 Aplt. App. 904 (emphasis added).

We refer to this document as the "2005 Resolution." The parties dispute whether this action by the PDC effectively amended the Plan.

Following the 2005 Resolution, Qwest provided plan participants with (1) a Summary of Material Modification ("SMM"), (2) a 2006 Occupational Benefit Program Guide, and (3) a Benefit Enrollment Statement, all of which reflected the reduced benefit. See 7 Aplt. App. 1352, 1367, 1413. Qwest also sent a letter to

-8-

the Association of US West Retirees ("AUSWR"), a group to which many retirees belonged, noting the change. 7 Aplt. App. 1353-54. Qwest notified Prudential Insurance Company of American ("Prudential"), its life insurance provider, of the change, and on January 1, 2006, Prudential began administering the Plan in accordance with the 2005 Resolution. See 6 Aplt. App. 1219; Kerber, 656 F. Supp. 2d at 1284. Qwest's 2005 year-end Form 10-K contained a note to the consolidated financial statements disclosing the reduced life insurance benefit. See 7 Aplt. App. 1295.

Similar events occurred approximately one year later, this time with respect to Pre-1991 Retirees. On September 14, 2006, the PDC approved a resolution (the "2006 Resolution") which recommended that, effective January 1, 2007, the Director of Employee Benefits be authorized to change the basic life insurance benefit for Pre-1991 Retirees to a flat $10,000. 10 Aplt. App. 1959. One month later, Qwest sent to all plan participants (1) an SMM noting the reduced benefits, (2) a 2007 Pre-1991 Retiree Benefit Program Guide that noted the change, and (3) a Benefit Enrollment Statement reflecting the flat $10,000 benefit. See id. at 2049, 2053, 2069. Again, Qwest sent a letter to the AUSWR regarding the change, notified Prudential, and Prudential administered the Plan consistent with the 2006 Resolution beginning January 1, 2007. See 9 Aplt. App. 1921; 10 Aplt. App. 2074.

On December 13, 2006, the PDC executed "Amendment 2006-1," which

contained language similar to the 2005 Resolution reducing the life insurance benefits for Post-1990 Retirees to a flat $10,000.  See 4 Aplt. App. 698. Amendment 2006-1 purported to apply retroactively as of January 1, 2006, and stated, "RESOLVED, that the Life Plan be and hereby is amended to incorporate the amendments and modifications outlined above and in substantially the form attached hereto," and "RESOLVED, that administrative practices previously adopted within the terms of the foregoing resolutions are hereby affirmed, approved and ratified in all respects."  Id. at 699.

On February 7, 2007, Qwest and Prudential entered into a written amendment to the group life insurance contract regarding the Plan (the "Group Contract").  9 Aplt. App. 1921.  However, Qwest did not sign that amendment. Plaintiffs argue that the amendment to the Group Life Insurance Contract did not become effective until Qwest signed it on January 21, 2009, and, therefore, the amendments to the Plan did not become effective until that date.

E.     Litigation History.

Three separate rounds of motions and decisions form the basis for this appeal.

First, in May 2007, Plaintiffs filed an amended complaint (the "AC") that asserted three claims under ERISA.  Claim 1 sought recovery under two theories: (1) Qwest's amendment of the Plan to provide a flat $10,000 benefit violated ERISA section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), because the terms of the

Plan did not allow benefits lower than the floor provided by the Minimum Benefits Provision; and (2) Qwest should be equitably estopped from amending the Plan to provide benefits lower than the Minimum Benefits Provision, because Qwest had misled the Plaintiffs into thinking that such reductions were impermissible or would not be taken. See id. at 57-59. Qwest moved to dismiss, arguing that Qwest unambiguously reserved the right to amend the Plan at any time and for any reason, that the Tenth Circuit did not recognize ERISA equitable estoppel claims, and that in any event Plaintiffs did not properly allege the elements of such a claim. See 1 Aplt. App. 116, 127-28.

The district court granted the motion. See Kerber v. Qwest Life Ins. Plan, 544 F. Supp. 2d 1187 (D. Colo. 2008). It agreed with Qwest that the Plan unambiguously reserved the right to amend the Plan at any time, citing the closely analogous plan language in Chiles v. Ceridian Co., 95 F.3d 1505 (10th Cir. 1996). Kerber, 544 F. Supp. 2d at 1193-94. The court also noted that the Tenth Circuit had not recognized ERISA equitable estoppel claims, but even if such a claim was viable it would not apply because the ROR was unambiguous and Plaintiffs failed to allege the extraordinary circumstances necessary to state a claim for equitable estoppel. Id. at 1195-96.

Second, in April 2008 Plaintiffs filed a second amended complaint ("SAC") that asserted eight claims under ERISA. 5 Aplt. App. 958. Claims 1 and 7 were dismissed, and Plaintiffs do not challenge that decision on appeal. Aplt. Br. 5.

Both parties filed cross-motions for summary judgment on Claims 3, 4, and 5 of the SAC. 6 Aplt. App. 1174 (Qwest's motion); 5 Aplt. App. 874 (Plaintiffs' motion). Claim 3 alleged that the October 2005 Resolution passed by the PDC did not effectively amend the Plan; Claim 4 alleged that Amendment 2006-1 was ineffective for failure to strike inconsistent language in the Plan; and Claim 5 alleged that Qwest violated the Prior Loss Proviso with respect to plan participants who had died in 2006 by retroactively changing the life insurance benefit. See 5 Aplt. App. 959-60.

The district court again granted summary judgment to Qwest. With regard to Claim 3, the court held that the 2005 Resolution embodied the intent of the PDC to amend the plan, so an amendment was effectuated under Curtiss-Wright v. Schoonejongen, 514 U.S. 73, 85 (1995). Kerber v. Qwest Group Life Ins. Plan, No. 07-cv-00644, 2009 WL 928329, at *4-5 (D. Colo. Mar. 31, 2009). Further, subsequent actions by Qwest and Prudential had ratified the PDC's resolution. Id. at *6. Regarding Claim 4, the court held that the amendment procedures did not require that inconsistent language be explicitly stricken, and therefore the terms of Amendment 2006-1 controlled regardless of the existence of facially inconsistent language. Id. at *7. Finally, the court held that summary judgment on Claim 5 was appropriate because the Plan had been amended or ratified in 2005, before January 1, 2006, and the amendment procedure for the Plan did not require amendment to the Group Insurance Contract. Id. at *7.

-12-

Third and finally, Qwest filed motions for summary judgment on Claims 2, 6, 7, and 8 of the SAC. 8 Aplt. App. 1633; 9 Aplt. App. 1883. Claim 2 alleged breach of fiduciary duty for material misrepresentations, in violation of 29 U.S.C. § 1132(a)(1), and Claim 6 alleged that the 2006 Resolution did not amend the Plan and retroactive application of a later amendment reducing benefits to Pre-1991 Retirees violated the Prior Loss Proviso of the Plan. See 5 Aplt. App. 959-60. Claims 7 and 8 are not at issue on appeal. Aplt. Br. 5.

On August 25, 2009, the district court granted the motion on Claims 2, 6, and 8; determined that Claim 7 was moot; and dismissed the case. See Kerber, 656 F. Supp. 2d 1279. The court held that Plaintiffs failed to demonstrate a genuine dispute of material fact that they had reasonably relied on any material misrepresentation by Qwest, id. at 1288, and that Claim 6 was not substantially different than Claim 5—on which the court had previously granted summary judgment—and thus summary judgment was appropriate for substantially the same reasons. Id. at 1293-94.

Plaintiffs filed a motion for reconsideration under Rule 59(e), Fed. R. Civ. P., which the district court denied. See Kerber v. Qwest Group Life Ins. Plan, 727 F. Supp. 2d 1076 (D. Colo. 2010). Plaintiffs timely appealed. See 13 Aplt. App. 2793.

<u>Discussion</u>

Plaintiffs' appeal raises seven issues: whether the district court erred (1) in holding that Qwest unambiguously reserved the right to amend the Plan, notwithstanding the Minimum Benefits Provision (dismissal of Claim 1 of AC); (2) in dismissing Plaintiffs' ERISA equitable estoppel claim, (dismissal of Claim 1 of AC); (3) in determining that the 2005 Resolution or subsequent ratification effectively amended the Plan (summary judgment on Claim 3 of SAC); (4) in determining that Amendment 2006-1 effectively amended the Plan (summary judgment on Claim 4 of the SAC); (5) in determining that the Prior Loss Proviso was not violated (summary judgment on Claim 5 of SAC); (6) in determining that the 2006 Resolution effectively amended the Plan (summary judgment on Claim 6 of SAC); and (7) in determining that Qwest had not breached its fiduciary duties by materially misrepresenting Qwest's ability to amend the Plan (summary judgment on Claim 2 of SAC). Aplt. Br. 3-4. We address each issue in turn, after discussing the standards of review.

We review de novo a district court's dismissal of a complaint under Rule 12(b)(6), Fed. R. Civ. P, applying the same legal standard as the district court. <u>Jordan-Arapahoe, LLP v. Bd. of Cnty. Comm'rs</u>, 633 F.3d 1022, 1025 (10th Cir. 2011) (citations omitted). We must accept as true "all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." <u>Smith v. United States</u>, 561 F.3d 1090, 1098 (10th Cir. 2009).

-14-

In order to survive a motion to dismiss, the complaint must allege sufficient facts to make the claim plausible on its face. Jordan-Arapahoe, 633 F.3d at 1025 (citation omitted). In addition to the allegations contained in the complaint, we may consider attached exhibits and documents incorporated into the complaint, so long as the parties do not dispute the documents' authenticity. Smith, 561 F.3d at 1098. In this case, both parties stipulated to the authenticity of the 1998 Plan documents. See Kerber v. Qwest Group Life Ins. Plan, No. 07-cv-0064-WDM-KLM, 2008 WL 4630558, at *2 (D. Colo. Oct. 17, 2008). The district court dismissed Claim 1 of the AC, which forms the first two issues on appeal.

We review the grant of summary judgment de novo, applying the same standard as the district court. Oldenkamp v. United Am. Ins. Co., 619 F.3d 1243, 1246 (10th Cir. 2010) (citation omitted). In so doing, we view the evidence and make inferences in the light most favorable to the non-movant. Id. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Although we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party, the nonmoving party must present more than a scintilla of evidence in favor of his position." Ford v. Pryor, 552 F.3d 1174, 1177-78

-15-

(10th Cir. 2008) (citation omitted).  The district court granted summary judgment to Qwest on Claims 2, 3, 4, 5 and 6 of the SAC, which form the basis for the last five issues on appeal.

A.    Qwest's Reduction of Benefits: Claim 1 of the AC.

Plaintiffs first appeal the district court's dismissal of Claim 1 of the AC. Aplt. Br. 3; 13 Aplt. App. 2794; see Kerber, 544 F. Supp. 2d 1187.  In relevant part, Claim 1 alleges that Qwest's reduction of life insurance benefits below the Minimum Benefits Provision constituted a breach of fiduciary duty.  1 Aplt. App. 57.

At the outset, the parties dispute the characterization of Claim 1.  Plaintiffs contend that Claim 1 alleged that "the Plan's rules circumscribed the Plan sponsor's general right to reduce retirees' Basic Life Coverage."  Aplt. Br. 3.  To the contrary, Qwest characterizes Claim 1 as a "contractual vesting claim," which requires Plaintiffs to show clear contractual language vesting the life insurance benefits.  Aplee. Br. 24-25.  Plaintiffs argue that characterization of Claim 1 is important because they do not allege that the Plan created vested rights—indeed, Plaintiffs concede that Qwest could have completely terminated the life insurance benefits.  Aplt. Reply Br. 1.  Plaintiffs contend that Claim 1 alleges only that the Minimum Benefits Provision served as a limitation on the ROR clause, prohibiting amendment of the life insurance benefits below the amounts provided in Appendix 7.  Id.  Thus, according to Plaintiffs, they need not prove clear

-16-

contractual language vesting the benefit.  The district court characterized Claim 1 as a "contractual bar" claim, but analyzed it akin to a contractual vesting claim. See Kerber, 544 F. Supp. 2d at 1192.

Characterization of Claim 1 is irrelevant for our purposes.  The Reservation of Rights Clause unambiguously reserves in Qwest the right to amend the Plan. The Minimum Benefits Provision serves only as a limitation on reductions under the Reduction Formula, not as an overarching limitation on the Plan as a whole. Accordingly, Claim 1 fails under either characterization—the Plan neither contractually vests the benefits nor proscribes amendments below the amounts provided in the Minimum Benefits Clause.

Three rationales support our holding.  First, when read as a whole, the Reservation of Rights Clause clearly controls the entire Plan, while the Minimum Benefits Provision serves only as a floor to reductions of the benefit under the Reduction Formula.  Second, under the interpretive canon *expressio unius est exclusio alterius*—the expression of one thing excludes all others—Qwest's right to amend the Plan is limited only by the Prior Loss Proviso, as the Prior Loss Proviso is the only limitation contained in the Reservation of Rights Clause. Third, our holding is strongly supported, if not compelled, by Chiles, 95 F.3d 1505, a case that dealt with closely analogous language.

*1. The Minimum Benefits Provision Serves Only as a Floor to the Reduction Formula.*

We review ERISA plans as a whole; if they are unambiguous, we construe the Plan as a matter of law. Chiles, 95 F.3d at 1511. In order to determine whether a plan is ambiguous, we consider the "common and ordinary meaning as a reasonable person in the position of the plan participant . . . would have understood the words to mean." Salisbury v. Hartford Life & Acc. Co., 583 F.3d 1245, 1248 (10th Cir. 2009) (internal quotation marks and citation omitted).

Viewing the Plan Documents as a whole, it is clear that the Minimum Benefits Provision serves as a limitation only on the Reduction Formula, not on the Plan as a whole. The Minimum Benefits Provision is not a separate clause or section of the Plan—it is the sentence following the Reduction Formula, deep within subsection 2.6 of Article II of the Plan. See id. at 619, 624. Article II of the Plan is entitled "Eligibility and Participation" and contains details regarding qualified participants and the benefits for which they are eligible. Id. at 619. Further, the Minimum Benefits Provision references the Reduction Formula, strongly implying that its application is limited to reductions under the Formula. See 3 Aplt. App. at 624 ("Notwithstanding the foregoing . . . such Basic Life Coverage amounts shall not be reduced below certain minimum amounts . . . ." (emphasis added)). Nothing in the Minimum Benefit Provision so much as suggests that it is intended to serve as an overarching limitation on the Plan as a

whole.

On the other hand, the Reservation of Rights Clause is contained in Article X of the Plan, entitled "Amendment and Termination." Id. at 638. Article X contains only two subsections: the Reservation of Rights Clause at issue here, and an analogous subsection reserving the right to terminate the Plan. Id. The Reservation of Rights Clause does not reference any particular part of the Plan, nor does its language suggest that its applicability is limited to Article X. Id. Thus, the Reservation of Rights Clause is clearly intended to apply to the Plan as a whole.

In sum, there is simply no indication that the Minimum Benefits Provision of subsection 2.6(a) somehow serves as an overarching limitation on the entire Plan. It is safe to assume that the drafters of the Plan did not intend to "hide elephants in mouseholes." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001). Only by considering the Minimum Benefits Provision apart from its overall context do Plaintiffs arrive at their interpretation. Reading the Plan Documents as a whole confirms the district court's interpretation: the Minimum Benefits Provision serves as a limitation on the Reduction Formula, while the Reservation of Rights Clause governs the entire Plan.

*2. The ROR Is Limited Only by the Prior Loss Proviso.*

The Reservation of Rights Clause contains a single internal limitation, the Prior Loss Proviso, which prohibits retroactive application of amendments that

reduce benefits.  See 3 Aplt. App. 638.  Thus, under the interpretive canon of *expressio unius est exclusio alterius*—which we have previously applied to ERISA plans, see Chiles, 95 F.3d at 1512—inclusion of the Prior Loss Proviso as a limitation on the Reservation of Rights Clause compels the conclusion that the Prior Loss Proviso is the only limit on Qwest's rights under the ROR.  This confirms our interpretation of the Plan Documents: the Minimum Benefits Provision does not proscribe Qwest's rights to amend the Plan under the Reservation of Rights Clause.

*3. Our Disposition is Dictated by Precedent.*

Third and finally, we dealt with a similar reservation of rights clause in Chiles, 95 F.3d at 1508.  In that case, the Summary Plan Description ("SPD") of a long-term disability plan contained a reservation of rights clause that reserved in the employer the right to amend or terminate the long-term disability benefits, except for those who were totally disabled as of the date of termination.  Id. at 1509.  We held that the reservation of rights clause was unambiguous and precluded the plaintiffs' claim that their rights to long-term disability benefits had contractually vested.  Id. at 1512-14.  Although in Chiles the plaintiffs claimed that long-term disability benefits had vested and could not be revoked, whereas in this case Plaintiffs concede that Qwest could have terminated the plan, Aplt. Br. 17, the district court correctly noted that our interpretation of a similar reservation of rights clause in Chiles compels a similar disposition here.

-20-

See Kerber, 544 F. Supp. 2d at 1193-94.

Plaintiffs advance several arguments on appeal, none of which we find persuasive. First, Plaintiffs argue that at the time the district court dismissed Claim 1, Qwest had not disclosed Appendix 8 to the Plan. Aplt. Br. 21. According to Plaintiffs, the eventual production of Appendix 8 undercuts the district court's order dismissing Claim 1. Id. However, Appendix 8 is nearly the same as Appendix 7, and in any event Appendix 7—not Appendix 8—is referenced by subsection 2.6(a). See 3 Aplt. App. 624. Further, Plaintiffs specifically stipulated that the Plan Documents attached to Qwest's Motion to Dismiss—which did not contain Appendix 8—comprised the Plan Documents on which their claims were based. See Kerber, 2008 WL 4630558, at *2. Finally, Plaintiffs filed a motion for reconsideration and a motion to alter or amend the judgment, but did not raise any arguments relating to Appendix 8. See 13 Aplt. App. 2735. Indeed, in their brief before us, Plaintiffs liken the situation to one where relief would be available from the district court under Rule 60(b). Aplt. Br. 23. But we are not the proper forum for a Rule 60(b) motion. Accordingly, we find no basis for reversal due to the apparent confusion over Appendix 8. See Kerber, 2008 WL 4630558, at *2-3 (noting that Appendix 8 appeared to be either a mistake or a draft of Appendix 7 never incorporated into the Plan Documents).

Second, Plaintiffs argue that the district court erred in determining that the Minimum Benefits Clause was tied to the Reduction Formula because "the

-21-

[minimum benefits set forth in Appendix 7] do not even remotely refer to a formula." Aplt. Br. 5. But that argument is simply not correct. As we have explained, the Minimum Benefits Clause incorporates Appendix 7 as providing the applicable numerical minimum dollar amount, see 3 Aplt. App. 624-25, and the Minimum Benefits Clause specifically references the Reduction Formula, id. ("Notwithstanding the foregoing . . . ."). Thus, the Minimum Benefits Clause is indeed "tied to the Plan's age based reduction formula." Aplt. Br. 15.

Finally, Plaintiffs argue that the district court erred by "fail[ing] to give specific terms greater weight than general language." Id. at 17. Again, that is simply not the case. Both the Minimum Benefits Clause and the Reservation of Rights Clause speak with roughly equivalent specificity. Compare 3 Aplt. App. 624-25 with 4 Aplt. App. 638. Therefore, we doubt that this principle of contractual interpretation is applicable here. Additionally, Plaintiffs' cited principle of interpretation is helpful only where the specific and general language conflict. See, e.g., Rosillo-Puga v. Holder, 580 F.3d 1147, 1160 (10th Cir. 2009); Shawnee Tribe v. United States, 423 F.3d 1204, 1213 (10th Cir. 2005). In this case, the clauses do not conflict—the Minimum Benefits Clause limits reductions under the Reduction Formula, while the Reservation of Rights Clause governs the Plan Documents as a whole. We therefore affirm the district court's dismissal of Claim 1 of the AC.

B.    ERISA Equitable Estoppel: Claim 1 of the AC.

ERISA preempts state law causes of action, including state law promissory estoppel claims. See Averhart v. US West Mgmt. Pension Plan, 46 F.3d 1480, 1485 (10th Cir. 1994). While some other circuits have created a federal common-law cause of action premised on equitable estoppel in the ERISA context, see, e.g., Pell v. E.I. DuPont de Nemours & Co., 539 F.3d 292, 300 (3d Cir. 2008), we have yet to recognize such a claim. Callery v. U.S. Life Ins. Co., 392 F.3d 401, 407 (10th Cir. 2004). We have left open the possibility that an ERISA estoppel claim might be viable in "egregious cases," such as where the employer lied, engaged in fraud, or intended to deceive the participants, id. at 407-08, or where the claim was premised on the employer's interpretation of an ambiguous provision in the plan, Averhart, 46 F.3d at 1486.

In this case we need not determine whether to adopt an estoppel claim in the ERISA context. Plaintiffs do not allege circumstances such as lies, fraud, or intent to deceive. See 1 Aplt. App. 57-59. Further, as we held above, the Plan unambiguously reserved to Qwest the right to amend or terminate the Basic Life Coverage. Accordingly, Plaintiffs' equitable estoppel claim would fail as a matter of law even if we were to adopt the ERISA equitable estoppel cause of action. We therefore affirm the district court's decision dismissing Claim 1 of the AC.

C.     Effect of the 2005 Resolution: Claim 3 of the SAC.

Claim 3 of the SAC alleges that the 2005 Resolution did not effectively amend the Plan because it was not adopted and incorporated into the Plan Documents.  5 Aplt. App. 981.  Qwest moved for summary judgment, arguing that the 2005 Resolution sufficiently manifested Qwest's intent to amend the Plan or, in the alternative, that Qwest ratified the amendment by its subsequent actions.  See 6 Aplt. App. 1184, 1191.

The district court granted the motion, holding that Qwest's actions—specifically, approving the 2005 Resolution, sending out notices of the changes to plan participants, and conducting itself in accordance with the 2005 Resolution—sufficiently manifested its intent to amend the Plan under Curtiss-Wright.  See Kerber, 2009 WL 928329, at *4-6.  Further, the court held that the 2005 Resolution was "adopted" within the meaning of the Prior Loss Proviso before January 1, 2006.  Id. at *7.

On appeal, Plaintiffs argue that the district court erred in several respects. First, Plaintiffs argue that the 2005 Resolution did not amend the Plan because the Resolution is unclear as to its effect and does not use the word "adopt," as, they argue, is required by the Prior Loss Proviso.  Aplt. Br. 31-33.  Second, Plaintiffs argue that Qwest's subsequent ratification of the 2005 Resolution cannot serve as an "adoption" for purposes of the Prior Loss Proviso, and that "the dates on which Qwest either made announcements or mass mailed notices to retirees are

-24-

irrelevant for purposes of enforcing Plan beneficiaries' rights under the Prior Loss Proviso." Id. at 32. Third, for the first time on appeal, Plaintiffs argue that the 2005 Resolution did not amend the Plan because the Resolution uses the phrase "Basic Life Insurance Benefit," not "Basic Life Coverage" as used in the Plan Documents. Id. at 33. Fourth and finally, Plaintiffs argue that when compared to Amendment 2006-1, a later action by the PDC that purports to formally adopt the 2005 Resolution, the 2005 Resolution's informality and confusing language raises a genuine dispute of material fact as to the effect of the 2005 Resolution. Id. at 36-37.

We are not persuaded by Plaintiffs' arguments, and we affirm the district court's grant of summary judgment. The record reveals no genuine dispute that Qwest, through the 2005 Resolution, intended to reduce the life insurance benefits for Post-1990 Retirees to a flat $10,000 benefit.

In Curtiss-Wright, the Supreme Court held that a reservation of rights clause similar to the one in this case provided a procedure for amending an ERISA plan. 514 U.S. at 81. The Court remanded to the court of appeals to engage in a "fact-intensive inquiry, under applicable corporate law principles, into what persons or committees . . . possessed plan amendment authority, . . . and whether those persons or committees actually approved the new plan provision." Id. at 85. Accordingly, we must determine whether the PDC possessed plan amendment authority and whether it actually approved the reduced life insurance

benefit.

Neither party disputes that the PDC had the power to amend the Plan on behalf of the Company. The remaining issue, then, is whether there is a genuine factual dispute whether the PDC actually approved the changes in the 2005 Resolution. Id., 514 U.S. at 85. Like the district court, we hold that the evidence shows beyond dispute that the PDC approved the changes. Qwest's subsequent actions confirm that the 2005 Resolution actually amended the Plan.

First, the 2005 Resolution itself manifests the PDC's intent to amend the Plan. The final sentence of the 2005 Resolution reads: "RESOLVED, that the Qwest Group Life Insurance Plan be and hereby is amended and restated to incorporate the design changes approved." 5 Aplt. App. 905 (emphasis added). The Resolution listed three apparent "design changes;" the one relevant to this appeal states, "Change the Basic Life Insurance Benefit for Post-1990 Occupational Retirees to reduce it to a fixed $10,000 benefit effective January 1, 2006." Id. Through this language, the PDC expressed its intent to amend the Plan.

It is true that the 2005 Resolution is not altogether unambiguous—the aforementioned changes are styled as recommendations to authorize the Director of Employee Benefits to "take all actions appropriate to implement" the changes. Id. This ambiguity does not create a genuine dispute of material fact, however. Ultimately the 2005 Resolution "amend[ed] and restate[d]" the Plan to

-26-

"incorporate the design changes approved." Id. It makes little sense to refer to a recommendation of authorization as a design change; likewise, it is nonsensical to "amend[] and restate[]" the Plan to "incorporate" a recommendation authorizing the Director to make changes. Hence, the "design changes" that were approved and incorporated into the Plan by the 2005 Resolution must be the substantive changes contained therein—including the change to a flat $10,000 benefit for Post-1990 Retirees. Accordingly, the PDC actually amended the Plan through the 2005 Resolution. Our conclusion is bolstered by affidavits from the members of the PDC, wherein each member states that he or she intended the 2005 Resolutions to amend the Plan. See 6 Aplt. App. 1218; 7 Aplt. App. 1346-47, 1350.

Second, Qwest's subsequent actions confirm that the PDC actually approved the 2005 Resolution, and that the Plan was thereby amended. Following the 2005 Resolution, Qwest sent to all plan participants a SMM, a 2006 Occupational Benefit Program, and a Benefit Enrollment Statement, all of which explained that the life insurance benefit would be reduced to $10,000 as of January 1, 2006. See 7 Aplt. App. 1352, 1367, 1413; see Kerber, 2009 WL 928329, at *1 (explaining the contents of the Enrollment Statement). Qwest also notified Prudential, the issuer of the group insurance policy, of the changes, and Prudential began to administer the Plan in accord with the 2005 Resolution. See 6 Aplt. App. 1219. Qwest also notified the AUSWR and the United

-27-

Communications Workers of America of the changes, see id. at 1224; 7 Aplt. App. 1353-54, and Qwest's 2005 year-end 10-K reflected the reduced life insurance benefit, see 7 Aplt. App. 1295. This extensive, undisputed evidence compels the conclusion that Qwest intended the 2005 Resolution to amend the Plan. Accordingly, the district court correctly granted summary judgment to Qwest.

Plaintiffs' arguments to the contrary are unavailing. First, we note that Plaintiffs argue for the first time on appeal that the 2005 Resolution was ineffective because it purported to amend the "Basic Life Insurance Benefit"—a term not used in the Plan Document—instead of "Basic Life Coverage," the proper term. See Aplt. Br. 33. Because this argument was not presented to the district court and Plaintiffs do not attempt to argue plain error, we will not address it on appeal. See Richison v. Ernest Group, Inc., 634 F.3d 1124, 1128 (10th Cir. 2011). But even if Plaintiffs had made that argument below, it would fail because the 2005 Resolution and subsequent actions prove beyond dispute that the PDC actually amended the Basic Life Coverage, regardless of the minor differences in language.

Second, given the evidence in favor of Qwest, the fact that the 2005 Resolution styles the changes as a "recommendation" does not raise a genuine dispute of material fact. Although the "recommendation" language may be confusing, as we note above a careful reading of the 2005 Resolution reveals that

-28-

the Resolution approved and incorporated into the Plan Documents the "design changes" contained in the Resolution, and that those "design changes" refer to the listed substantive changes. See *supra*. Further, any ambiguity in the 2005 Resolution was resolved upon issuance of the SMM, Program Guide, and Enrollment Statement, not to mention the notification to Prudential, the AUSWR, and the IRS, as well as the PDC members' affidavits. This overwhelming evidence supporting the conclusion that Qwest, acting through the PDC, actually amended the Plan cannot be overcome by the slight confusion caused by styling the amendment as a recommendation.

Third, Plaintiffs argue that the 2005 Resolution did not amend the Plan because "there was no decisive action taken either to create a restated Plan document or formally adopt an enabling amendment to the Master Plan Document until December 14, 2006." Aplt. Br. 34-35. However, this argument is beside the point. Neither the procedures for amending the Plan nor the 2005 Resolution require action beyond actual approval of an amendment in order for the amendment to take effect. Qwest merely had to follow the amendment procedure outlined in the ROR—that "the Company" amend the Plan, which in turn requires only (1) that the amending body have the power to do so, and (2) the amending body "actually approve" the amendment. See 3 Aplt. App. 638; Curtiss-Wright, 514 U.S. at 85. Because the PDC had the power to amend the Plan, the 2005 Resolution itself effectuated a valid amendment. Qwest's alleged failure to take

further action—and, particularly, Qwest's failure to strike inconsistent Plan language—is irrelevant.

Finally, the fact that the 2005 Resolution does not use the word "adopt" is of no consequence. As the district court correctly noted, because the word "adopt" is not defined in the Plan Documents, we give it the "common and ordinary meaning as a reasonable person in the position of the plan participant." Kerber, 2009 WL 928329, at *7 (internal quotation marks and citation omitted). We also agree with the district court that, in common usage, "adopt" means to embrace, approve, conform, or to accept and put into effect. Id. Under this definition, an amendment can certainly be adopted without using the word "adopt," so long as that amendment is embraced, approved, accepted or put into effect. In this case, the evidence shows that, acting through the PDC, Qwest did indeed approve the 2005 Resolution and put it into effect. See discussion *supra*. Therefore, the amendments contained in the 2005 Resolution were adopted within the meaning of the Prior Loss Proviso on October 14, 2005.

In sum, the evidence produced by Qwest establishes beyond dispute that the 2005 Resolution reduced Post-1990 Retirees' life insurance benefit to a flat $10,000. Therefore, the district court correctly granted summary judgment to Qwest on Claim 3 of the SAC.

D.    Effect of Amendment 2006-1: Claim 4 of the SAC.

Claim 4 of the SAC alleges that Amendment 2006-1 was ineffective for two

reasons: (1) it did not remove or strike inconsistent terms from the Plan Documents, and (2) Qwest did not amend the Group Contract with Prudential. 5 Aplt. App. 981.

The district court granted summary judgment to Qwest on Claim 4, holding that Amendment 2006-1 was effective because the procedures for amending the Plan did not require striking inconsistent Plan language or amending the Group Contract in order for an amendment to take effect. Kerber, 2009 WL 928329, at *7. The court also noted that failure to amend the Group Contract could possibly form the basis of a challenge to the administration of benefits under the plan documents rule; however, the SAC did not allege such a claim. See id. & n.10.

On appeal, Plaintiffs advance two arguments. First, they argue that the SAC did allege that Qwest's administration of benefits violated the plan documents rule, and therefore Qwest's failure to amend the Group Contract entitles them to recovery. See Aplt. Br. 39. Second, they renew their argument that Amendment 2006-1 was ineffective because it did not strike inconsistent terms in the main Plan Documents. See Aplt. Br. 42.

At the outset, we note that we need not address Plaintiffs' second argument, given our disposition of Claim 3 of the SAC. As we hold above, the 2005 Resolution reduced the life insurance benefit for Post-1990 Retirees to a flat $10,000, effective January 1, 2006. See supra. Therefore, the effectiveness of Amendment 2006-1 is irrelevant—as of December 12, 2006, when Amendment

-31-

2006-1 was approved, Plaintiffs' Basic Life Coverage had already been reduced to $10,000. However, we note that the Plan's amendment procedures do not require that inconsistent Plan language be stricken or that the Plan documents be reformed in order to become effective. See 3 Aplt. App. 638. Therefore, Plaintiffs' second argument is unavailing, even if it were relevant to our final disposition of Claim 4.

Plaintiffs' first argument is not supported by the record. Claim 4 of the SAC does not allege that Qwest violated the plan documents rule by failing to abide by the terms of the Group Contract in administering Plaintiffs' claims. Rather, Claim 4 alleges that Amendment 2006-1 was ineffective for failure to strike language contained in the Plan Documents, and that Plaintiffs were therefore entitled to benefits under the prior, unamended terms of the Plan. See 5 Aplt. App. 959-60, 981-82. Indeed, the SAC cites 29 U.S.C. § 1104(a)(1)(D)—the statutory section that embodies the plan documents rule, see Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan, 555 U.S. 285, 129 S. Ct. 865, 868 (2009)—only in the context of Plaintiffs' allegations that Qwest violated the Prior Loss Proviso and in the prayer for relief. See 5 Aplt. App. 977, 992. Likewise, the SAC mentions the Group Contract only to allege that Prudential, along with Qwest, was a fiduciary under the Plan. Id. at 966.

The SAC is bereft of any allegation that Qwest violated the plan document rule by failing to administer the Plan in accordance with the Group Contract.

Therefore, even if the Group Contract was incorporated by the Plan—and we doubt that it was, see Kerber, 2009 WL 928329, at *7 n.11—the SAC simply does not allege violation of the plan documents rule. Instead, Claim 4 alleges only that Amendment 2006-1 was ineffective. Given our disposition of Claim 3, Claim 4 is irrelevant—the Basic Life Coverage for Post-1990 Retirees had been reduced to $10,000 as of January 1, 2006, before the PDC approved Amendment 2006-1. Even so, Amendment 2006-1 was effective, notwithstanding the fact that it did not explicitly strike inconsistent Plan language. Accordingly, we affirm the district court's grant of summary judgment on Claim 4.

E.    Prior Loss Proviso: Claim 5 of the SAC.

Claim 5 of the SAC alleges that application of Amendment 2006-1 violates the Prior Loss Proviso as applied to Post-1990 Retirees who died before December 12, 2006, the date on which Amendment 2006-1 was approved. 5 Aplt. App. 982.

The Prior Loss Proviso provides, "no amendment shall reduce the benefits of any Participant with respect to a loss incurred prior to the date such amendment is adopted." 3 Aplt. App. 638. We previously held that the 2005 Resolution amended the Plan to provide a flat $10,000 benefit to Post-1990 Retirees. See *supra*. The 2005 Resolution was adopted on October 14, 2005, and reduced benefits starting January 1, 2006. See *supra*. Accordingly, Post-1990 Retirees' benefits were reduced as of January 1, 2006, and application of the

reduced benefits to persons who died after that date does not violate the Prior Loss Proviso. We therefore affirm the district court's grant of summary judgment on Claim 5 of the SAC.

F.     The 2006 Resolution: Claim 6 of the SAC.

Claim 6 of the SAC alleges that retroactive application of any reduction in life insurance benefits to Pre-1991 Retirees violates the Prior Loss Proviso. 5 Aplt. App. 984. This claim apparently relates to the 2006 Resolution, which Plaintiffs argue was ineffective. See 10 Aplt. App. 1959. According to Plaintiffs, because the 2006 Resolution did not effectively reduce life insurance benefits to Pre-1991 Retirees, application of reduced benefits to Pre-1991 Retirees who died after January 1, 2006, and before the date on which an effective amendment was adopted violates the Prior Loss Proviso. See Aplt. Br. 44-45, 47.

The district court granted summary judgment to Qwest on Claim 6, holding that "the same reasoning [the court] applied in the March 31, 2009 Order [granting summary judgment to Qwest on Claim 5] is applicable here." Kerber, 656 F. Supp. 2d at 1293. The court went on to note the similarities between the events surrounding the 2005 and 2006 Resolutions, and concluded that Qwest sufficiently manifested its intent to amend the Plan to reduce the life insurance benefit for Pre-1991 Retirees beginning January 1, 2007, by passing the 2006 Resolution. Id. at 1294.

We agree with the district court. In all material respects, the 2006

-34-

Resolution is similar to the 2005 Resolution. Like the 2005 Resolution, the 2006 Resolution states, "RESOLVED, that the Qwest Group Life Insurance Plan be and hereby is amended to incorporate the design changes approved." 10 Aplt. App. 1959. The body of the Resolution provides, "**Recommendation:** that the Director, Employee Benefits, . . . be authorized to take all actions appropriate to implement for the 2007 Plan year: . . . Change the Basic Life Insurance Benefit for the Pre-1991 Retirees to reduce it to a fixed $10,000 benefit effective January 1, 2007." Id.

In affidavits, the members of the PDC stated that the 2006 Resolution was intended to amend the Plan. See 9 Aplt. App. 1909-10, 1913-14, 1921. After the 2006 Resolution Qwest sent to plan participants (1) a SMM, (2) a Program Guide, and (3) a Benefit Enrollment Statement reflecting the reduced life insurance benefit for Pre-1991 Retirees. 10 Aplt. App. 2049, 2053, 2069. Qwest also sent a letter to the Association of US West Retirees regarding the change. 10 Aplt. App. 2074. Finally, Qwest notified Prudential of the change, and Prudential began administering the Plan consistent with the 2006 Resolution. See 9 Aplt. App. 1921; 10 Aplt. App. 1998-99.

Given the similarities between the 2005 and 2006 Resolutions, and the lack of any genuine disputes of material fact as to their effect, our disposition must be the same. Just as with the 2005 Resolution, it is undisputed that the PDC had the power to amend the Plan and the PDC actually amended the Plan by way of the

2006 Resolution. Thus, the reduction in benefits was adopted on September 14, 2006, to take effect on January 1, 2007, and application of the reduced benefits to Pre-1991 Retirees who died after that date does not violate the Prior Loss Proviso.

Plaintiffs' arguments regarding Claim 6 are substantially similar to those made with respect to Claim 3, compare Aplt. Br. 44-47, with id. at 37, and we find them unavailing for the same reasons. We affirm the district court's grant of summary judgment on Claim 6 of the SAC.

G.    Breach of Fiduciary Duty: Claim 2 of the SAC.

Claim 2 of the SAC alleges that Qwest misrepresented to Pre-1991 Retirees that under the 5+5 Option their life insurance benefits could not be reduced below the amount set forth in the Minimum Benefits Provision. See 5 Aplt. App. 979-80. The district court granted summary judgment to Qwest, holding that each of the alleged material misrepresentations either was not a misrepresentation, was immaterial, or was not relied upon by the Plaintiffs. Kerber, 656 F. Supp. 2d at 1288.

The Tenth Circuit has not adopted a test for breach of fiduciary duty claims premised on material misrepresentations. The district court employed the Third Circuit's test as expressed in Daniels v. Thomas & Betts Corp., 263 F.3d 66, 73 (3d Cir. 2001). See Kerber, 656 F. Supp. 2d at 1287. Plaintiffs urge us to adopt the Third Circuit's test as set forth in In re Unisys Corp. Retiree Medical Benefits ERISA Litigation, 579 F.3d 220 (3d Cir. 2009), Aplt. Br. 55, while Qwest cites a

First Circuit case for the proposition that informal communications contradicted by the underlying plan documents cannot form the basis for a material misrepresentation claim, Aplee. Br. 52 (citing Balestracci v. NSTAR Elec. & Gas Corp., 449 F.3d 224, 233-34 (1st Cir. 2006)).

In this case, we need not determine what version of the test to adopt. Under any test, the Plaintiffs would be required to allege a material misrepresentation.  See, e.g., Unisys, 579 F.3d at 228; Moore v. LaFayette Life Ins. Co., 458 F.3d 416, 433 (6th Cir. 2006) (internal quotation marks and citation omitted); Hammonds v. Reynolds Metal Co., 219 Fed. App'x 910, 916-17 (11th Cir. 2007) (unpublished); Ballone v. Eastman Kodak Co., 109 F.3d 117, 122 (2d Cir. 1997).  Because, as we discuss below, the statements on which Plaintiffs rely are not material misrepresentations, we affirm the district court's grant of summary judgment on Claim 2.

On appeal, Plaintiffs point to three alleged material misrepresentations in support of Claim 2: (1) a description of the insurance plan sent to employees as part of the 5+5 Option (the "Insurance Plan Description" or "IPD"), (2) statements made during a video conference ("Video Conference") intended to explain the 5+5 Option, and (3) confirmation statements sent to retirees in 2001 through 2004 ("Confirmation Statements").[2]  See Aplt. Br. 48-51, 54.  We address

_____

[2]  Before the district court, Plaintiffs apparently argued that the reservation
(continued...)

-37-

each in turn.

*1. Insurance Plan Description.*

In December 1989, Qwest sent a packet of information to employees describing the benefits available under the 5+5 Option. 8 Aplt. App. 1639; 9 Aplt. App. 1797. Included in this information was an Insurance Plan Description ("IPD"). See 9 Aplt. App. 1797. The first page of the IPD stated, in bolded text, "While the plans listed below are the plans currently provided to eligible employees upon retirement, the Company reserves the right to amend or terminate any or all provisions in the future for any reason." Id. at 1797. The next page, in the sub-part labeled "Group Life Insurance Program," provided, "your Basic coverage . . . continues at no cost to you. The amount of coverage is based on one times your pay immediately prior to retirement (rounded up to the next $1,000). However, your coverage will be reduced by 10% beginning on your 66th birthday and each year thereafter up to a maximum reduction of 50% at age 70."

_____

[2](...continued)
of rights clause in the 1987 SPD was ambiguous and therefore constituted a material misrepresentation. See Kerber, 656 F. Supp. 2d at 1288. However, on appeal, Plaintiffs argue that the 1987 SPD was ambiguous, but do not argue that the 1987 SPD, in and of itself, constituted a material misrepresentation. See Aplt. Br. 50-51. Rather, they argue that the 1987 SPD was ambiguous, and that the subsequent Video Conference, Insurance Plan Description, and Confirmation Statements constituted material misrepresentations as to the meaning of the reservation of rights clause in the 1987 SPD. See Aplt. Br. 51. Therefore, we consider only the three subsequent alleged material misrepresentations, not the 1987 SPD itself.

Id. at 1798.

The district court held that the IPD clearly indicated that Qwest retained the right to amend the Plan, and therefore did not constitute a material misrepresentation. Kerber, 656 F. Supp. 2d at 1289. As that is the only reasonable reading, we agree. The first page of the IPD unambiguously states that the plans described are the plans then provided by Qwest, and that Qwest "reserves the right to amend or terminate any or all provisions in the future for any reason." 9 Aplt. App. 1797. The statement regarding the "maximum reduction of 50% by age 70" clearly indicates that the benefits will not be reduced by the formula below 50%—it is not a promise that Qwest would not amend the Plan. Id. at 1798. Accordingly, the Insurance Plan Description does not constitute a material misrepresentation and cannot form the basis for Plaintiffs' breach of fiduciary duty claim.

*2. Video Conference.*

In response to questions about the 5+5 Option, Qwest conducted a question-and-answer video conference. See Kerber, 656 F. Supp. 2d at 1283. The following colloquy appeared in the video:

> **Moderator**: . . . There is a statement in some of the paperwork that people received in their packets that's raised some questions, and that is the statement that says the company reserves the right to change benefits. There are some people worried about that. Can you speak to that statement?
>
> **Human Resource Director Charlie Kamen:** Sure. That's a typical

-39-

reservation of rights statement that appears in virtually every employee benefit plan, not just U.S. West benefit plans, but all companies' benefit plans. It is not intended to be divisive, it is not intended to be a below the board type of thing. What it is intended to do though, is it's intended to give the company the ability to modify the plans as circumstances and conditions change in the future. It's really intended to make the plans more meaningful and more affordable <u>not only for the employees but for the company</u>.

Id. (emphasis added).

Plaintiffs argue that the statement by Mr. Kamen represented that Qwest did not reserve the right to amend or terminate the Plan, and that the video conference reflected an effort to conceal the possible adverse consequences of the ROR in order to induce retirees into accepting the 5+5 Option. Aplt. Br. 52. Thus, Plaintiffs assert that this segment of the video conference constitutes a material misrepresentation. Id. at 53. They argue that the reduction of the life insurance coverage does not "make the Plan more meaningful and/or more affordable for retirees." Id. at 54-55.

The district court held that the video conference was not a misrepresentation, as it "clearly indicated that Qwest maintained the right to alter or terminate the Life Benefit." Kerber, 656 F. Supp. 2d at 1289. Again, we agree. Even assuming, without deciding, that an oral statement that contradicts unambiguous, written plan language could form the basis of a material misrepresentation claim, the statements in the video conference are not misrepresentations. But see Ladouceur v. Credit Lyonnais, 584 F.3d 510, 512-

-40-

513 (2d Cir. 2009) (holding that oral statements that contradict clear plan language cannot form the basis for material misrepresentation claims). In the video conference, Mr. Kamen unequivocally states that the ROR is "intended to give the company the ability to modify the plans as circumstances and conditions change in the future." Kerber, 656 F. Supp. 2d at 1283. This statement correctly explains the ROR: the company retains the ability to modify the Plan as conditions change. Mr. Kamen then notes that the ROR is "intended to make the Plan more meaningful and more affordable not only for the employee, but for the company." Id. Again, this statement is correct: the ROR clause permitted Qwest to modify the Plan both to benefit retirees—as it did in 1997 by adding the Minimum Benefits Provision—and to make it more affordable to the company, as it did by reducing the Basic Life Coverage to a flat $10,000. The video conference is completely accurate, and therefore cannot constitute a material misrepresentation. This is particularly true where, as here, the various written documents unambiguously reserve in Qwest the right to amend or terminate the Plan.

*3. Confirmation Statements.*

In 2001 through 2004, Qwest mailed Confirmation Statements to retirees. See 4 App. 688 (2001), 690 (2002), 693 (2003), 695 (2004). These statements confirmed that life insurance coverage was available under the Plan, and contained a statement noting that Qwest reserved the right to amend or terminate

-41-

Plan benefits <u>except</u> for those who retired before 1991. <u>See, e.g.</u>, <u>id.</u> at 688-89.

However, the Confirmation Statements also stated that "The exact details of these

plans are included in the legal plan documents that govern them. If there's a

discrepancy between this worksheet and the plan documents, the plan documents

will govern." <u>See, e.g.</u>, <u>id.</u> at 689.

The district court held that although the Confirmation Statements contained

misrepresentations—that Qwest could not amend the Plan as to Pre-1991

Retirees—Plaintiffs failed to allege reliance on those statements. <u>Kerber</u>, 656 F.

Supp. 2d at 1292. Thus, the district court held, even assuming the

misrepresentations were material, summary judgment for Qwest was appropriate

because an allegation of detrimental reliance was required to sustain a breach of

fiduciary duty claim premised on material misrepresentations. <u>Id.</u>

We need not decide whether detrimental reliance is a required element of a

claim for breach of fiduciary duty premised on material misrepresentations. The

misrepresentations in the Confirmation Statements were not material, and

therefore summary judgment to Qwest on this issue was appropriate.[3]

A misrepresentation is material "'if there is a substantial likelihood that it

would mislead a reasonable employee in making an adequately informed

---

[3] We may uphold a district court's decision on any ground supported by
the record, regardless of whether it is argued on appeal or whether it formed the
basis for the decision below. <u>See</u> <u>Thompson v. Gibson</u>, 289 F.3d 1218, 1221
(10th Cir. 2002) (citation omitted).

[retirement] decision.'" Horn v. Cendant Operations, Inc., 69 Fed. App'x 421,

428 (10th Cir. 2003) (unpublished) (quoting Jordan v. Fed. Exp. Corp., 116 F.3d

1005, 1015 (3d Cir. 1997)).  In this case, all Plaintiffs asserting Claim 2 retired in

or before 1991.  See 1 Aplt. App. 32-34; 5 Aplt. App. 959 (asserting Claim 2 on

behalf of only Pre-1991 Retirees).  The first of the Confirmation Statements were

sent nearly a decade later, in 2001.  See 4 Aplt. App. 688.  Therefore, any

misrepresentations in the Confirmation Statements could not have informed

Plaintiffs' retirement decisions in any way.  Accordingly, the misrepresentations

in the Confirmations Statements were immaterial, and summary judgment to

Qwest was appropriate.

Indeed, we doubt whether any of the alleged misrepresentations are

material.  On appeal, Plaintiffs strongly emphasize that they do not challenge

Qwest's ability to terminate the Basic Life Coverage.  Aplt. Br. 17.  Rather, they

argue only that Qwest could not amend the Basic Life Coverage below the amount

set forth in the Minimum Benefits Provision.  Id.  We fail to see how

misrepresentations regarding Qwest's ability to decrease life insurance coverage

would effect a reasonable employee's retirement decision, where Qwest

admittedly retains the right to terminate life insurance coverage.  We would think

that a reasonable employee who knew that Qwest could terminate life insurance

coverage—yet still retired under the 5+5 Option—would make the same decision

even with the knowledge that Qwest could reduce that same coverage.

-43-

In any event, the record reveals that the only actual misrepresentation made by Qwest—contained in the Confirmation Statements first distributed in 2001—was not material, as it was issued nearly ten years after Plaintiffs decided to retire and not obtain other life insurance. Therefore, the district court correctly granted summary judgment to Qwest on Claim 2 of the SAC.

AFFIRMED.