FILED
United States Court of Appeals
Tenth Circuit

September 25, 2007

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RODNEY MILLER,

Plaintiff-Appellant,

v.

MONUMENTAL LIFE INSURANCE
COMPANY and NASRA TPA, Inc.
and its successor, HCC
ADMINISTRATORS INC. and/or
GALLAGHER BASSETT SERVICES,
INC.,

Defendants-Appellees.

No. 05-2247

---

**Appeal from the United States District Court for the District of New Mexico**
**(D.C. No. 2:04-cv-970-JB)**

---

James Rawley, Albuquerque, NM, for Plaintiff-Appellant.

Bernie E. Hauder, Adkerson, Hauder & Bezney, Dallas, TX (Bruce S. McDonald
and Lucinda Siembieda, Law Offices of Bruce S. McDonald, Albuquerque, NM,
with him on the briefs) for Defendants-Appellees.

---

Before **HENRY**, **McWILLIAMS**, and **TYMKOVICH**, Circuit Judges.

---

**HENRY**, Circuit Judge.

Rodney Miller filed suit in the United States District Court for the District of New Mexico challenging Monumental Life Insurance's (Monumental's) denial of a request for long-term disability benefits. The district court granted summary judgment for Monumental. Because the Employment Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461, governs the terms of Monumental's master-group insurance policy, the district court's jurisdiction arose under 28 U.S.C. § 1331. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse and remand.

## I. BACKGROUND

In September of 1997, Rodney Miller was injured in an automobile accident while working for Aycock Transportation, a Texas corporation. After receiving 24 months of Temporary Disability benefits from Monumental, Aycock's provider of a master-group policy (the Plan), Mr. Miller applied for the Plan's Continuous Total Disability Benefit (Continuous Benefit), a long-term disability payment. In order to qualify for the Continuous Benefit, an applicant must be "Totally Disabled," which the Plan defines as "unable to perform every duty pertaining to any occupation for which he is or may become qualified by education." Aplt's App. at 37 (Monumental's Master Policy, effectuated June 10, 1996). The Plan also requires applicants to present proof of a Social Security Disability Award, which the Plan defines as "Social Security disability benefits for which the Insured Person has submitted a claim and [has] been approved for payment by the

2

Social Security Administration." *Id.*

Mr. Miller applied for disability benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. § 401 *et. seq.* Although the Social Security Administration (SSA) administers both programs, the Supreme Court has outlined their distinctions: "Title II is an insurance program. Enacted in 1935, it provides old-age, survivor and disability benefits to insured individuals irrespective of financial need. Title XVI is a welfare program. Enacted in 1972, it provides [Social Security Insurance] benefits to financially needy individuals who are blind, or disabled regardless of their insured status." *Bowen v. Galbraith*, 485 U.S. 74, 75 (1988) (citation omitted).

The SSA denied Mr. Miller's claim for Title II disability insurance benefits because he had failed to accrue "sufficient quarters of coverage[1] to confer disability insured status." Aplt's App. at 93 (Social Security Administration Office of Hearings and Appeals Decision, filed August 28, 2003) (Title II Decision). Nevertheless, the SSA granted Mr. Miller's claim for Title XVI supplemental social security income benefits because the administrative law judge (ALJ) determined that he met the regulatory standard for physical disability and had basically no income. Mr. Miller sent Monumental notice of the SSA's Title

---

[1] "[Quarters of Coverage] are used in determining insured status [under Title II]. In general, you are credited with [Quarters of Coverage] based on the wages you are paid and the self-employment income you derive during certain periods." 20 C.F.R. § 404.101(b) (2007).

3

XVI Decision, but Monumental denied payment on the grounds that it was not a Social Security Disability Award. Mr. Miller brought suit challenging Monumental's conclusion.

Because Monumental had not retained authority to interpret the Plan, the district court reviewed Monumental's denial of coverage de novo. Reasoning that "there is little difference between New Mexico law and Texas law," *Miller v. Monumental Life Ins. Co.*, 376 F. Supp. 2d 1238, 1248 (D. N.M. 2005), the district court applied New Mexico law to interpret the term Social Security Disability Award. The court granted Monumental's motion for summary judgment on the theory that the Plan unambiguously provided that a Title XVI award was not a Social Security Disability Award. More specifically, the district court found that the "phrase [Social Security Disability Award] has a technical meaning that does not include [Social Security Income] payments" and refused to "go beyond the technical meaning of Social Security Disability Award." *Id.* at 1250. The court emphasized "that the language in each of these places means what Monumental meant it to say when it wrote [the] definition." *Id.* This appeal followed.

## II. DISCUSSION

We begin by holding that the district court erred in interpreting the Plan according to New Mexico law because ERISA pre-empts state rules of insurance contract interpretation. *See Blair v. Metro. Life Ins. Co.*, 974 F.2d 1219, 1221-22

4

(10th Cir. 1992) (applying federal common law to interpret an ERISA plan). Then, applying federal common law, we determine that the proper inquiry is not what Monumental intended a term to signify; rather, we consider the "common and ordinary meaning as a reasonable person in the position of the [plan] participant . . . would have understood the words to mean." *Admin. Comm. of Wal-Mart Assocs. Health & Welfare Plan v. Willard*, 393 F.3d 1119, 1123 (10th Cir. 2004) (internal quotation marks omitted). Employing this standard, we hold that the Plan is ambiguous because a reasonable plan participant could easily conclude that a Title XVI award coupled with a finding of physical disability would constitute a Social Security Disability Award for the purposes of the Continuous Benefit. We then apply the doctrine of *contra proferentem*, which strictly construes ambiguities in insurance contracts against the drafter.

## A. ERISA PRE-EMPTION

We review de novo the question of what law governs our interpretation of the Plan. *Mowry v. United Parcel Serv.*, 415 F.3d 1149, 1152 (10th Cir. 2005). Although the district court applied New Mexico law to interpret the Plan, the parties do not dispute that federal law governs our determination of whether the Plan is ambiguous. We agree.

Congress enacted ERISA to ensure national uniformity in fiduciary standards for the administration of employee benefit plans. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 104 (1983). To that end, it included a broad provision

5

that "pre-empts all state laws insofar as they may now or hereafter relate to any employee benefit plan." *Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 333 (2003) (internal quotation marks omitted). Nevertheless, even under this expansive preemption scheme, "state 'law[s] . . . which regulat[e] insurance' . . . are saved from pre-emption." *Id.* (quoting 29 U.S.C. § 1144(b)(2)(A)). In *Miller*, the Supreme Court held that "for a state law to be deemed a 'law . . . which regulates insurance' under § 1144(b)(2)(A), it must satisfy two requirements. First, it must be specifically directed toward entities engaged in insurance. Second . . . the state law must substantially affect the risk pooling arrangement between the insurer and the insured." *Id.* at 341-42.

Like the Seventh Circuit, "[w]e cannot imagine any rational basis for the proposition that state rules of contract interpretation 'regulate insurance' within the meaning of § 1144(b)(2)." *Hammond v. Fid. & Guar. Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir. 1992). In the context of the saving clause, the *Miller* Court described an insurance regulation as a law that placed "conditions on the right to engage in the business of insurance." 538 U.S. at 338. Rules of contract interpretation "force the insurer to bear the legal risks associated with unclear policy language." *Hammond*, 965 F.2d at 430. Shifting legal risk is, however, "a far cry from . . . transferring or spreading a policyholder's risk." *Id.* (internal quotation marks omitted). Thus, the rules of contract interpretation at issue do not satisfy the first prong of the *Miller* inquiry.

6

Our decision to apply federal common law is consistent with our precedent, and that of the vast majority of other circuits. *See Blair*, 974 F.2d at 1222 ("MetLife urges us to apply federal common law, governed by principles of trust law. We do so.") (internal citation omitted); *see also Thibodeaux v. Cont'l Cas. Ins. Co.*, 138 F.3d 593, 596 (5th Cir. 1998); *Hammond*, 965 F.2d at 430; *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150, 153 (8th Cir. 1990); *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1440-41 (9th Cir. 1990); *McMahan v. New England Mut. Life Ins. Co.*, 888 F.2d 426, 429-30 (6th Cir. 1989); *Sampson v. Mut. Benefit Life Ins. Co.*, 863 F.2d 108, 110 (1st Cir. 1988).

## B. AMBIGUITY

Having determined that state law is pre-empted, we now assess whether the plan is ambiguous.

### 1. **Standard of Review**

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court observed that ERISA imposes upon providers a fiduciary duty similar to the one trustees owe trust beneficiaries. *Id.* at 110 ("ERISA's legislative history confirms that the Act's fiduciary responsibility provisions . . . codify and make applicable to ERISA fiduciaries certain principles developed in the evolution of the law of trusts.") (internal quotation marks omitted). Just as a trustee must conduct his dealings with a beneficiary with the utmost degree of honesty and transparency, an ERISA provider is required to clearly delineate the

7

scope of its obligations.

This fiduciary duty also enables ERISA providers to retain the authority to interpret ambiguous provisions in a plan. When an ERISA provider retains this authority in explicit terms, we employ a deferential standard of review. *Id.* at 111 (noting that "[t]rust principles make a deferential standard of review appropriate" when an ERISA provider has explicitly retained the authority to interpret ambiguous plan). In the instant case, however, Monumental did not reserve any such powers of interpretation. Hence, we review the contract and Monumental's denial of benefits de novo. *Id.* at 115 (noting that where the benefit plan does not give the administrator or another fiduciary discretion to determine eligibility or construe the terms of a plan, "a denial of [ERISA] benefits . . . is to be reviewed under a de novo standard").

"In interpreting an ERISA plan, [we] examine[] the plan documents as a whole and, if unambiguous, construe[] them as a matter of law." *Willard*, 393 F.3d at 1123. "Ambiguity exists where a plan provision is reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of the term." *Id*. In order to determine whether a plan is ambiguous, we consider the "common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean." *Id*. Thus, we must determine whether a reasonable person in Mr. Miller's position would have believed that the Title XVI award combined with a finding of

8

physical disability would have satisfied the requirement that he receive a Social Security Disability Award.

2. **The Plan is ambiguous**

The ERISA plan at issue is an "Occupational Accident Plan," Aplt's App. at 35, meant to provide temporary or permanent disability payments for employees who suffer debilitating on-the-job injuries. *Id.* at 40 (stating that the Plan provides indemnity for an employee who sustains injuries "while performing the duties of his regular occupation"). After "examin[ing] the plan documents as a whole," *Willard*, 393 F.3d at 1123, it is clear that the Plan's requirement of a Social Security Disability Award serves as a delegation of substantive disability determinations to the SSA. The Plan mandates that a beneficiary be incapable of engaging in productive labor. However, it provides no mechanism for assessing his physical condition, other than whether he has received a Social Security Disability Award. As evidenced by the prolonged litigation in this case, when it comes to physical disability, Monumental is not simply willing to take a beneficiary at his word. By requiring that a claimant obtain a Social Security Disability Award, Monumental provides a reliable and uniform mechanism for ensuring that those claiming disability benefits are in fact unable to engage in productive labor.

Monumental's delegation suggests that a reasonable person could have expected Mr. Miller's Title XVI award and the SSA's finding of disability to have

satisfied the Social Security Award requirement. The ALJ who ruled that Mr. Miller met the Title XVI requirements for disability, found that Mr. Miller suffered from "the following medically determinable severe impairments: chronic back and neck pain associated with facet anthropathy with cervical and lumbar radiculopathy, carpal tunnel syndrome, bipolar affective disorder and valvular heart disease with valve replacement." Aplt's App. at 87 (Social Security Administration Office of Hearings and Appeals Decision, filed March 30, 2001) (Title XVI Decision). In light of his physical impairments, education, and job skills, the SSA concluded that Mr. Miller was "unable to perform every duty pertaining to any occupation for which he is or may become qualified by education, training or experience . . . ." *Id.* at 88. This finding seems to satisfy the Plan's requirement that a recipient of Continuous Benefit be "unable to perform the physical and mental requirements of any past relevant work." *Id.* at 37. Given the similarity between the SSA ruling and the Plan's requirements, Mr. Miller could have reasonably expected that the Title XVI award would have satisfied the Social Security Award prescription.

An examination of the programs' respective regulations strengthens our conclusion that a reasonable plan participant could reasonably believe that either a Title II or a Title XVI award was a Social Security Disability Award. To begin, for the purposes of determining physical disability, there is virtually no distinction between the programs. As the district court noted, "the definition for

10

'total disability' is the same under Title II and Title XVI." *Miller*, 376 F. Supp. 2d at 1245. Both Title II and Title XVI use the same five-step evaluation sequence to determine disability. 20 C.F.R. § 404.1520 (Title II), § 416.920 (Title XVI). In addition, both programs use the same Listing of Impairments, 20 C.F.R. § 404.1525 (Title II), § 416.925 (Title XVI), and employ identical Medical-Vocational Guidelines. 20 C.F.R. § 404.1501(g)(6) (Title II), § 416.901(j)(6) (Title XVI). Finally, a decision from the SSA that a claimant is disabled under either Title II or Title XVI results in a money award.

In contrast to the Title XVI Decision, the ALJ's findings in the Title II proceeding bore no relation to Mr. Miller's ability to engage in productive labor. In order to be eligible for Title II benefits, "an individual must be both insured for disability benefits and disabled within the meaning of the Act." *See Harvell v. Chater*, 87 F.3d 371, 372 (9th Cir. 1996); *see also* 20 C.F.R. § 404.130. Title II insurance operates somewhat like a typical insurance program in that only those who have paid into the system are covered, and coverage depends upon whether a taxpayer has accrued sufficient quarters of coverage. One may obtain quarters of coverage by working qualified job and reporting a minimum level of income. S*ee Harvell*, 87 F.3d at 373 (noting that an applicant was not covered for the purposes of Title II because he had "worked in non-covered employment . . . and paid no social security taxes during that period"); *United States v. Smith*, 294 F. Supp. 2d 920, 921 n.2 (E.D. Mich. 2003) (explaining that Title II eligibility depends upon

11

the "payment of social security taxes").  Because Mr. Miller had failed to file a legitimate tax return since 1997, and perhaps none before that, the ALJ found that the last day he could have been covered was December 31, 1996.  Due to his "lack of appropriate insured status," Aplt's App. at 92 (Title II Decision), he was not eligible for benefits on September 15, 1997, the date when his disabling injury occurred.  Thus, the ruling was a result of Mr. Miller's failure to file tax returns and accrue "sufficient quarters of coverage to meet the criteria for disability insured status . . . ." *Id.* at 91.

Nevertheless, Monumental contends that the Plan unambiguously precludes Mr. Miller's recovery because a Title XVI award "is **not** a Social Security Disability Award."  Aplt's Br. at 18 (emphasis in original).  Relying heavily on the district court decision, Monumental avers,

> [Title XVI] benefits are not disability benefits. [Title XVI] benefits are supplemental income, which can be paid for a number of reasons that people lose income, only one of which is a welfare program enacted to provide benefits to financially needy individuals who are aged, blind, or disabled regardless of their insured status. [Social Security Disability] benefits, on the other hand, are awarded under Title II, which is an "insurance program" that Congress enacted to provide old-age, survivor, and disability benefits to insured individuals irrespective of financial need.

Id. at 17-18 (quoting *Miller*, 376 F. Supp. 2d at 1250).  This is essentially a summary of one paragraph of Supreme Court dicta from *Bowen*, 485 U.S. at 75.

Under the proper circumstances, this argument might be more persuasive. Here, the problem is that Monumental assumes *Bowen*'s dicta is dispositive when

12

in fact it is inapplicable. In *Bowen*, the Court was asked to determine, "whether, under Title XVI of the Social Security Act, a district court has the authority to order the Secretary of Health and Human Services to withhold a portion of past-due supplemental security income benefits for the payment of attorney's fees." *Id.* at 74. Here, we are *not* called upon to interpret the Social Security Act; rather, we address the discrete question of whether the Title XVI award at issue coupled with a finding of disability constituted a Social Security Disability Award under the Plan. In order to make this determination, we look not to the role each program plays in the grand scheme of Social Security entitlements, but to this particular plan's language and the SSA's determinations regarding Mr. Miller's condition.

Finally, Monumental emphasizes, and Mr. Miller does not contest, that the Title XVI benefits, which are need-based, would cease once Monumental began paying the Continuous Benefit because Mr. Miller would have too much income. However, he remains eligible for Title XVI benefits as long as Monumental refuses to pay Continuous Benefit. Thus, like Orr, the bomber pilot in Joseph Heller's renowned novel, Mr. Miller appears to be trapped in a now-proverbial "Catch-22." Monumental correctly observes that this appears to be an "absurd and unintended result," lending legitimacy to their interpretation of the Plan. Aple's Br. at 20. However, the question that confronts us is not whether their interpretation is reasonable, but whether there is more than one reasonable

13

interpretation of the Plan.

In sum, although Monumental's interpretation seems reasonable in many respects, because the SSA denied Title II benefits based on a rationale unrelated to disability, and because the purpose of the Plan is to provide compensation for debilitating injuries, it is also reasonable that a beneficiary in Mr. Miller's position could have expected the Title XVI award at issue to satisfy the Social Security Disability Award requirement. Hence, we hold that the Plan is ambiguous because the term "Social Security Award" "is reasonably susceptible to more than one meaning." *Willard*, 393 F.3d at 1123 (internal quotation omitted).

3.  **Extrinsic Evidence**

Monumental argues that if the Plan's language is ambiguous, this Court should resort to extrinsic evidence to interpret the term Social Security Disability Award. Where a plan's language is ambiguous on its face, courts may "turn to extrinsic evidence of parties' intent to create vested insurance benefits." *Deboard v. Sunshine Min. & Ref. Co.*, 208 F.3d 1228, 1241 (10th Cir. 2000). In *Deboard,* for example, correspondence between the parties exposed the employer's intent "to create vested rights to lifetime health insurance coverage." *Id.*

By contrast, the record in this case reveals no extrinsic evidence that would illuminate the parties' intent. Because this case was disposed of at summary judgment, the parties should have brought any extrinsic evidence to the district

14

court's attention before the court considered the motion.  In fact, at the district court's hearing on the summary judgment motion, the parties made clear that they had no additional evidence to present.  Aplt's App. at 56-57, 82-83.  Thus, remand for findings on extrinsic evidence would be futile.  Moreover, Monumental failed to raise this argument below.  Because Monumental has given no reason why we should depart from "the general rule that a federal appellate court does not consider an issue not passed upon below," *Walker v. Mather*, 959 F.2d 894, 896 (10th Cir. 1992) (internal quotation marks omitted), we deem the extrinsic evidence argument waived.

## C. INTERPRETING THE AMBIGUOUS TERM

Having decided that the Plan is ambiguous, and that we must use federal common law to interpret it, we must now select a mode of contractual interpretation.  We hold that the ambiguous term must be construed against Monumental in accordance with the doctrine of *contra proferentem*.

### 1. **Contra Proferentem**

*Contra proferentem* construes all ambiguities against the drafter.  *Todd v. AIG Life Ins. Co.*, 475 F.3d 1448, 1451-52 (5th Cir. 1995).  We have rejected *contra proferentem* in cases where the plan administrator retains discretion and where we review only to consider whether the administrator abused discretion.  *See Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100 (10th Cir. 1999) (holding "that when a plan administrator has discretion to interpret the plan and the standard of

15

review is arbitrary and capricious, the doctrine of *contra proferentem* is inapplicable"). Nevertheless, we have reserved the question of whether this court would apply *contra proferentem* in reviewing an ambiguous ERISA plan de novo. *See Blair*, 974 F.2d at 1222 (resolving ambiguities in favor of the drafter "without resort to the *contra proferentem* rule, and without resolving whether that rule should be applied to contracts governed by ERISA"). Today, we answer that question in the affirmative.

The parties acknowledge that most circuits employ *contra proferentem* to construe ambiguous language in contracts governed by ERISA where review is de novo. Indeed, since the majority of courts would apply *contra proferentem* in a case like this, employing the doctrine comports with the principle underlying ERISA preemption, uniformity. *See Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 557 n.7 (6th Cir. 1998); *Todd*, 47 F.3d at 1451-52; *Lee v. Blue Cross/Blue Shield of Alab.*, 10 F.3d 1547, 1551 (11th Cir. 1994) ("Having determined that the plan is ambiguous, we hold that application of the rule of contra proferentem is appropriate in resolving ambiguities in insurance contracts regulated by ERISA."); *Hughes v. Boston Mut. Life Ins. Co.*, 26 F.3d 264, 268 (1st Cir. 1994); *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1257-58 (3d Cir. 1993); *Delk v. Durham Life Ins. Co.*, 959 F.2d 104, 105-06 (8th Cir. 1992); *Glocker v. W.R. Grace & Co.*, 974 F.2d 540, 544 (4th Cir. 1992); *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 311 (7th Cir. 1992) ("The adoption by the district court of

16

the state law rule of contract interpretation *contra proferentem* as part of the federal common law of ERISA was proper."); *Masella v. Blue Cross & Blue Shield of Conn., Inc.*, 936 F.2d 98, 107 (2d Cir. 1991); *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 540 (9th Cir. 1990).

Strictly construing ambiguities against the drafter comports with our precedent. Our court has never construed the ambiguities of an ERISA plan against a beneficiary. *See Deboard*, 208 F.3d at 1243 ("Even assuming, *arguendo*, the evidence was equivocal regarding the parties' intent on this point, we believe the ambiguity should have been construed in favor of plaintiffs."); *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1518 (10th Cir. 1996) ("Any burden of uncertainty created by careless or inaccurate drafting . . . must be placed on those who do the drafting, and who are most able to bear that burden . . . .") (internal quotation marks omitted); *Blair*, 974 F.2d at 1222 ("Having determined that the policy is ambiguous we resolve that ambiguity in [the beneficiary's] favor based on the record in this case."). Doing so would undermine the policies underlying ERISA, which Congress enacted "to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits." *Firestone Tire & Rubber Co.*, 489 U.S. at 113 (internal quotation marks omitted). ERISA also gives significant benefits to providers by preempting many "state law causes of action . . . which threaten considerably greater liability than that allowed by ERISA." *Chiles*, 95 F.3d at 1518 (internal

17

quotation marks omitted). In light of the Act's balancing of interests, "[a]ccuracy [in drafting] is not a lot to ask. And it is especially not a lot to ask in return for the protections afforded by ERISA's preemption of state law causes of action." *Id.* (internal quotation marks omitted).

Failure to employ *contra proferentem* would "afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted, a result that would be at odds with the congressional purposes of promoting the interests of employees and beneficiaries and protecting contractually defined benefits." *Masella*, 936 F.2d 98 at 107 (internal quotation marks omitted). The Ninth Circuit presented an illuminating explanation for applying the doctrine.

> Insurance policies are almost always drafted by specialists employed by the insurer. In light of the drafters' expertise and experience, the insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand; if it fails to do this, it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence. Moreover, once the policy language has been drafted, it is not usually subject to amendment by the insured, even if he sees ambiguity; an insurer's practice of forcing the insured to guess and hope regarding the scope of coverage requires that any doubts be resolved in favor of the party who has been placed in such a predicament.

*Kunin*, 910 F.2d at 540. Strictly construing ambiguous terms presents ERISA providers with a clear alternative: draft plans that reasonable people can understand or pay for ambiguity.

Confronted with ambiguous language under a de novo standard of review and applying *contra proferentem*, we construe the Plan's terms in favor of Mr.

18

Miller and hold that his Title XVI award coupled with a finding of disability satisfied the Social Security Disability Award requirement.

2.    **Sole Causation**

We note that Monumental also moved for summary judgment on the grounds that Mr. Miller's accident was not the "sole cause" of his disability. Aplt's Supp. App. at 5 (Defendant's Motion for Summary Judgment, filed May 5, 2006).  Because the district court did not address this issue, we must remand for further proceedings.

### III.  CONCLUSION

We therefore REVERSE and REMAND for proceedings consistent with this opinion.