**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 29, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOSEPH E. MARTINEZ, and JENNIE
DARLENE MARTINEZ, as the spouse
of Joseph E. Martinez,

       Plaintiffs-Appellants,

v.

THE PLUMBERS & PIPEFITTERS
NATIONAL PENSION PLAN, THE
PLUMBERS & PIPEFITTERS
NATIONAL PENSION FUND, and
THE BOARD OF TRUSTEES OF
THE PLUMBERS & PIPEFITTERS
NATIONAL PENSION FUND,

       Defendants-Appellees.

No. 14-1315

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:12-CV-01063-MSK-MJW)**

---

Dennis P. Walker, Boesen Law, LLC, Denver, Colorado, for Appellants.

R. Richard Hopp, O'Donoghue & O'Donoghue LLP, Washington, DC, for
Appellees.

---

Before **TYMKOVICH**, **MATHESON**, and **MORITZ**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

Joseph Martinez was a long-term participant in the Plumbers and Pipefitters National Pension Plan, a multiemployer defined benefit pension plan governed by the Employee Retirement Income Security Act. Following some health problems, Martinez retired from plumbing in 2004 at age 56 and took advantage of the Plan's early retirement pension. After a few years in retirement, he felt well enough to resume working, and his pension was suspended during that time according to rules that prohibit retirement benefits during disqualifying employment. When he retired again in 2009, he asked the National Pension Fund to allow him to convert the pension benefits he previously elected from an early retirement pension to a disability pension—a change that would entitle him to higher monthly payments.

The Fund denied the conversion and the district court upheld the denial. We agree that the Plan language is unambiguous and allows Plan participants to apply for and receive only one type of pension benefit for life absent several clearly delineated exceptions, none of which apply to Martinez.

Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we affirm the Fund's denial of Martinez's claim for disability benefits.

## I. Standard of Review and Plan Provisions

After discussing the standard of review that guides us, we explain the Plan language in some detail and how it was applied to Martinez's request for a disability pension.

-2-

### A. Standard of Review

Our review is of the Fund's decision to deny Martinez benefits. *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009). We accord no deference to the district court's judgment. Accordingly, like the district court, we must determine the proper standard of review to apply to the Fund's denial of benefits. *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010).

In a suit to recover benefits under the Employee Retirement Income Security Act's (ERISA) enforcement provision, 29 U.S.C. § 1132(a)(1)(B),[1] our review is de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). In that case, we apply a deferential standard of review and "ask[] only whether the denial of benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008).

There is no question here that the Plan delegates such authority to the Trustees of the Fund and that a deferential standard of review is warranted. *See*

---

[1] 29 U.S.C. § 1132(a)(1)(B) provides a cause of action for a plan participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

*Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1232 (10th Cir. 2013). The Plan

reserves to the Trustees the discretion "to construe the terms of the Plan, to

resolve any ambiguities, and to determine any questions which may arise with the

Plan's application or administration, including but not limited to determination of

eligibility for benefits." Aple. App. 167 (Section 9.03); *id.* at 174 (Section

10.06).

Martinez urges that even if the review would otherwise be deferential,

procedural irregularities in the administrative appeal process warrant a lesser

standard of deference. We have applied de novo review where deferential review

would otherwise be required in the face of serious procedural irregularities.

*LaAsmar*, 605 F.3d at 797; *see, e.g.*, *Rasenack ex rel. Tribolet v. AIG Life Ins.

Co.*, 585 F.3d 1311, 1317–18 (10th Cir. 2009). It is unnecessary for us to

determine whether the Fund in fact violated ERISA's procedural requirements or

whether any of the alleged violations would be serious enough to warrant de novo

review because, even considering the Fund's denial of benefits de novo, we would

affirm.[2]

---

[2] To the extent Martinez means to argue for additional remedies relating to
the alleged procedural violations, the argument would fail because he has not
identified how he was prejudiced. "Not every procedural defect will upset the
decision of plan representatives," *Sage v. Automation, Inc. Pension Plan & Trust*,
845 F.2d 885, 895 (10th Cir. 1988), and Martinez has not alleged, nor can we
think of any "purpose [that] would be served by a further, but procedurally
correct, review" of his claim. *Id.*; *see also Brimer v. Life Ins. Co. of N. Am.*, 462
F. App'x 804, 808–09 (10th Cir. 2012) (requiring a showing of prejudice for
(continued...)

### B. *Plan Provisions and Martinez's Election*

The Plan offers seven types of pensions for which participants may apply upon retirement depending on the eligibility requirements. A participant who has not yet reached the normal retirement age of 65 is eligible for a disability pension if he is permanently and totally disabled and has accrued a certain number of employment hours and pension credit. The Plan deems a participant permanently and totally disabled only if the Social Security Administration (SSA) has awarded him social security disability benefits.

For a participant who wishes to begin receiving monthly benefits but has not yet received a decision from the SSA that would entitle him to a disability pension, the Plan offers the option of applying for a contingent early retirement pension. To be eligible, an applicant must be awaiting an SSA determination and otherwise be eligible for an early retirement pension. This is the situation in which Martinez found himself when he retired in 2004—awaiting a disability determination from the SSA. He decided to proceed with the application process and apply for a contingent early retirement pension.

The "contingent" aspect of the contingent early retirement pension refers to what happens to the pension when the SSA issues its decision. Before the

_____

[2](...continued)
remand); *id.* at 809 (citing *DiGregorio v. Hartford Comprehensive Emp. Benefit Serv. Co.*, 423 F.3d 6, 16 (1st Cir. 2005) ("Claimant must demonstrate how a plan's flawed procedure prejudiced review of her claim.")).

decision issues, a contingent early retirement pensioner receives monthly benefits in the amount of an early retirement pension. When the decision issues, the pension is automatically adjusted in one of two ways. If the SSA issues a favorable determination, the pension is adjusted to a disability pension and "the Participant shall thereafter receive the amount of the Disability Pension and be considered a Disability Pensioner." Aple. App. 158 (Section 4.16(b)(i)). If the SSA denies benefits, however, "the Participant shall thereafter receive the amount of the Early Retirement Pension and be considered an Early Retirement Pensioner." *Id.* (Section 4.16(b)(ii)). The Plan provides that "[s]uch adjustments"—meaning the adjustment to a disability or early retirement pension—"shall be made automatically and the Participant shall not otherwise be entitled to change the form of benefit." *Id.* (Section 4.16(b)(iii)).

Martinez does not contend that he did not have access to the Plan provisions governing the operation of a contingent early retirement pension before he made the election on his application. Moreover, before finalizing an application for a contingent early retirement pension, the Fund requires applicants to sign a form titled Contingent Early Retirement Pension—Declaration of Understanding. Martinez executed this form, which provided, in pertinent part:

> I understand that if I am denied a disability award from the [SSA], either upon appeal or choosing not to appeal:
>
> • I will be considered an Early Retirement Pensioner, retaining the same Effective Date of Benefits as

established for my Contingent Early Retirement Pension as if the benefit had always been an Early Retirement Pension.

- An adjustment will be made in my benefit to change from the Disability form to the non-Disability form,

- I shall not otherwise be entitled to change the form of benefit I originally elected, and

- *I shall become a permanent Early Retirement Pensioner regardless of whether I subsequently receive a disability award from the [SSA].*

. . . .

I have read and understood the above provisions stated in Section 4.16 of the Plan and their effect upon my receipt of the Contingent Early Retirement Pension.

*Id.* at 48 (emphasis added). After receiving his application and the executed forms, the Fund approved his contingent early retirement pension and set an effective date of November 1, 2004.

On January 1, 2005, the SSA denied Martinez's application for disability benefits. He notified the Fund of the denial and his decision not to appeal. The Fund sent him a letter notifying him that his pension would be converted to an early retirement pension in accordance with Section 4.16 of the Plan. Martinez did not appeal that determination, and he received early retirement pension benefits until June 2006. At that time, in need of additional income, he decided he was able enough to return to work.

The Plan specifically addresses the scenario in which a pensioner returns to work after retiring and applying for benefits. For any months spent working in disqualifying employment and for an additional six-month period following the end of such employment, the Plan provides that "[t]he monthly benefit shall be suspended." *Id.* at 171 (Section 9.07(a)). When a participant provides notice that he is returning to retirement, the Plan provides that "[b]enefits shall be resumed for months after the last month for which benefits were suspended." *Id.* at 172 (Section 9.07(g)).

The Plan also allows the Board of Trustees to grant waivers of the suspension of benefits for defined periods of time. The first year Martinez returned to work he did so under such a waiver. Accordingly, for one year, Martinez worked and continued to receive his early retirement pension benefits. At the close of the waiver period, Martinez notified the Fund of his decision to continue working. In a letter, he wrote:

> This letter is to inform you of my decision to terminate my Pension status, as of July 1, 2007, to return to the work force. I understand that a 30 day notice is required in writing prior to returning to work and canceling my pension eligibility, to avoid penalties. Due to an auto accident in the year 2000, I was forced into early retirement however, over the past few years, I have somewhat recovered from my injuries, and although there are limitations to my abilities, I feel at this time I am able to return to the work force.

*Id.* at 58.

The Fund sent Martinez a letter explaining that because he was returning to disqualifying employment, his benefits would be "suspended" effective July 1 and he would be subject to a further six-month suspension of benefits upon his "re-retirement." *Id.* at 60. Enclosed with the letter was a Resumption of Benefits form, which he was instructed to submit when he stopped his work in disqualifying employment. Also attached was a form titled, Summary of the Plan Provisions on Suspension of Benefits Due to a Return to Work. As its title indicates, the form explained in accordance with the relevant Plan provisions that pension payments are "suspended" for the period of time a pensioner returns to work and instructed, "[w]hen you stop working and want to retire again, you must notify the Fund in writing. Failure to give such notice will delay the resumption of payment of your benefit."[3] *Id.* at 63.

In early 2008, Martinez requested an estimate of what his pension pay would be if he "return[ed] to retirement." *Id.* at 65. On April 1, the Fund responded and again explained that because he returned to work before the age of 65, he was subject to an additional six-month suspension upon his "re-retirement." *Id.* at 66. Thus, his benefits would be "reinstated" on the first calendar day of the seventh month after he "re-retire[d]." *Id.* The Fund again

_____

[3] Martinez had also signed a Retirement Declaration prior to finalizing his selection of the contingent early retirement pension, which declared that he understood his "benefits will be suspended for any months in which I return to work [before age 65] for any amount of hours in Disqualifying Employment, plus an additional six months." Aple. App. 46.

enclosed the Summary of Provisions on Suspension of Benefits and a Resumption of Benefits form.

In October of the following year, Martinez submitted the following question through the Fund's website: "Given the state of the [economy] I am considering retiring at age 61 which will be in a few days.  My question is, what will my monthly income be if I was to choose 100% benefit for my wife."  App. 118.  A letter in response from the Fund stated:

> This letter is to acknowledge receipt of your inquiry. . . . Due to a large number of requests for information we have received, it may take us 4 to 6 weeks to respond to your inquiry. . . . Your Effective Date of Benefits is established as the first of the month following receipt of your Application of Benefits or the first of the month after you cease working.  If it is your intention to retire within the next 4 months, contact the Fund Office to request an Application for Benefits to allow adequate time for processing.

*Id.* at 149.  Martinez then submitted another question to the website, stating: "I [received] your [response] letter about my recent inquiry about retirement status. I am [planning] on early retirement due to the work picture in our industry.  I turn 61 years old tomorrow and would like to request an application for [retirement] as soon as possible[.]"  Aple. App. 72.  In response, the Fund mailed Martinez an Application for Benefits (not a Resumption of Benefits form).

These October exchanges are the only suggestion in the record that Martinez might qualify to retire anew and submit a second application for

benefits. But any apparent confusion was cleared up in subsequent interactions between Martinez and the Fund because on December 1, the Fund sent Martinez a letter stating, "In your recent telephone call to the . . . Fund, you advised that you plan to re-retire in the near future. You would like for the . . . Fund to reinstate payment of your pension benefit." *Id.* at 74. Enclosed was a Resumption of Benefits form (not an Application for Benefits) and instructions to complete the form in order to reinstate his benefits. The letter explained that "[u]pon receipt of this form, the Fund will advise you of the date your benefit can be reinstated and any adjustments or increases to your benefit that you may be entitled to receive based on your age or additional pension credit earned." *Id.* Martinez submitted the Resumption of Benefits form, and the Fund reinstated his early retirement pension benefits six months later on June 1, 2010.

In July, Martinez submitted a second application to the SSA for disability benefits. This time, the SSA issued a favorable determination finding that he was disabled as of April 2009. Martinez submitted the SSA's determination to the Fund and requested that his early retirement pension be converted to a disability pension—a change that would result in an increase of several hundred dollars in his monthly benefits. The Fund denied the request on the ground that the Plan "provides the terms and conditions under which the benefit of a Participant who is receiving an Early Retirement Pension may be adjusted to a Disability Pension," and Martinez did not fit those conditions. *Id.* at 88.

To understand the basis of the Fund's decision, we must pause and review the Plan provisions addressing a participant's entitlement to change the type of pension he is receiving. Section 4.19 of the Plan, titled Non-Duplication of Benefits, provides that "[a] person shall be entitled to only one type of pension benefit" with two exceptions: (1) "a Disability Pension recipient who recovers may be entitled to a different type of pension"; and (2) "a Contingent Early Retirement Pension or an Early Retirement Pension may be adjusted in accordance with Section 4.16." *Id.* at 159.

The first exception recognizes the possibility that a disability pensioner may recover from his disability and lose his status as permanently and totally disabled. If that happens, the disability pension ends, and the participant may return to work and later be eligible to receive a different type of pension.

The second exception can be further broken down into two parts: (1) adjustment to a disability pension from a contingent early retirement pension, and (2) adjustment to a disability pension from an early retirement pension. The former refers to the automatic adjustment to a disability pension provided for in Section 4.16(b)(i) when a contingent early retirement pensioner receives a favorable determination from the SSA. The latter refers to Section 4.16(c), which provides adjustments in two circumstances:

> (c)     Notwithstanding the above, the pension of a
>         Participant who is receiving an Early Retirement

-12-

Pension may be adjusted to a Disability Pension as follows:

(i)    If the Participant failed to elect the Contingent Early Retirement Pension on his application as required by Section 4.16(a), but otherwise met the requirements of this Section 4.16 at the time of his application, his pension will be adjusted as set forth above in Section 4.16(b)(i).

(ii)   If the Participant had not applied for a Social Security Disability Award at the time of his initial application, but subsequently submits a favorable determination by the [SSA] on his eligibility for a Disability Award and otherwise meets the requirements of Section 4.12, his pension may be adjusted if the date of disability as determined in accordance with Section 9.05(b)(ii) is on or before the Effective Date of Benefits of the Initial Early Retirement Pension.

*Id.* at 158.

Because Martinez's pension had already been adjusted to an early retirement pension at the time he requested the switch to a disability pension, the Fund relied on Section 4.16(c) in denying his request. Specifically, the Fund found Martinez did not qualify for an adjustment because his "Effective Date of Benefits with the Fund was November 1, 2004" and the SSA determined he was disabled as of April 2009. *Id.* at 88.

As was his right under the Plan, Martinez appealed the adverse benefit determination to the Board of Trustees. He made three arguments: (1) because he

-13-

now meets the eligibility requirements for a disability pension, he is entitled to disability benefits; (2) the SSA's favorable determination should trigger an automatic adjustment of his pension under Section 4.16(b)(i); and (3) he is entitled to an adjustment under Section 4.16(c)(ii) because his return to employment had terminated his pension and his 2009 retirement resulted in a new effective date of benefits in 2010. The Trustees affirmed the denial of benefits. They maintained that when the SSA denied Martinez's first application for a disability award and his contingent early retirement pension was automatically adjusted to an early retirement pension, his "benefit [would] thereafter [be] in the amount of the Early Retirement Pension and [he would be] considered an Early Retirement Pensioner." *Id.* at 115. The Trustees rejected the claim that Martinez's return to employment terminated his pension, instead finding that his early retirement pension was merely suspended and then reinstated when he stopped working again in 2009. Pursuant to Sections 4.16 and 4.19, the Trustees concluded he was not entitled to convert his early retirement pension to a disability pension.

Martinez and his wife, who is a co-beneficiary of Martinez's benefits, next sought review in state court under 29 U.S.C. § 1132(a)(1)(B), to recover the disability benefits he alleged were due to him under the Plan. The Fund removed the suit to federal court and the district court affirmed the Trustees' decision.

-14-

The court held the Plan was unambiguous and did not permit Martinez to convert his pension.

## II. Discussion

Martinez presents two arguments as to why he is entitled to a disability pension. First, he contends the Plan is unambiguous and its plain language entitles him to disability benefits. Second, he submits that even if he would not otherwise be entitled to benefits, the Fund misled him about benefit eligibility and should be equitably estopped from denying him a disability pension.

For the reasons discussed below, neither argument is persuasive.

### A. *The Plan Does Not Permit Martinez to Convert His Early Retirement Pension to a Disability Pension*

In reviewing ERISA policies, "[o]ur first task is to determine whether the policy is ambiguous." *Rasenack*, 585 F.3d at 1318. In making that determination, "we consider the common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the words to mean." *Id.* (quoting *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1249 (10th Cir. 2007)). Both the Fund and Martinez contend (with different outcomes) that there is no ambiguity in the relevant Plan provisions. *See* Reply Br. at 6 ("The Plan language is unambiguous." (emphasis in original)). Our review confirms the absence of ambiguity. Thus, we construe the Plan as a matter of law and compare the plain meaning to the rationale asserted by the Trustees in

denying Martinez's appeal. Finding no deviation between the two, we affirm the denial of benefits.

Martinez's first argument rests on the 2010 SSA decision that he was disabled as of April 2009. He says that because he now satisfies the eligibility requirements for a disability pension, the affirmative language used in the Plan—"A Participant *shall be entitled*"—requires that he be paid disability benefits. Aple. App. 157 (Section 4.12) (emphasis added); *see also id.* (Section 4.15) ("Payment of the Disability Pension *shall commence* . . . ." (emphasis added)). The Fund does not dispute that if Martinez were now to submit an *initial* application for a disability pension he would be eligible. But that is not what he did. Rather, he already retired and became an early retirement pensioner and thus the Fund contends his present eligibility is irrelevant. And absent proof that he qualifies for an adjustment in the type of pension under one of the exceptions recognized by the Plan, he must continue to receive an early retirement pension.

We agree with the Fund. To accept Martinez's argument would require us to ignore how the Plan operates as a whole. Our review of plan documents in ERISA appeals is not of individual provisions in isolation, but of the plan documents as a whole. *See Miller*, 502 F.3d at 1250. Here, the Plan is structured so that a participant must submit a written application to begin receiving benefits, and upon a determination of eligibility, the participant "shall be entitled upon Retirement to receive the monthly benefits provided for the remainder of his life,

subject to the provisions of th[e] Plan." *Id.* at 168 (Section 9.05). Martinez

retired in 2004, submitted an application for a contingent early retirement

pension, and was approved to begin receiving benefits with an effective date of

November 1, 2004. When the SSA denied his application for disability benefits,

the Fund automatically adjusted his contingent early retirement pension to an

early retirement pension, and the Plan provides that he "shall thereafter receive

the amount of the Early Retirement Pension and be considered an Early

Retirement Pensioner." *Id.* at 158 (Section 4.16(b)(ii)). Thus, the question

cannot be framed as whether Martinez now satisfies the eligibility requirements

for a disability pension. The question is whether, as an early retirement

pensioner, the Plan authorizes Martinez to adjust his pension to a disability

pension. The Trustees concluded it does not, and we reach the same conclusion.

As noted above, Section 4.19 provides that a participant "shall be entitled

to only *one* type of pension benefit" with two exceptions. *Id.* at 159 (emphasis

added). The common and ordinary meaning of this provision is that if a

participant does not fit within either exception, he will receive only one type of

pension. Martinez makes two arguments for a different reading of Section 4.19,

neither of which are persuasive. First, he contends that Section 4.19 only

prohibits a participant from receiving two types of pension benefits *at the same*

*time*, but not consecutively. This reading cannot be squared with the two listed

exceptions to Section 4.19, neither of which addresses a circumstance in which a

-17-

participant is entitled to two pensions at the same time, but instead circumstances in which a participant may be entitled to switch from one type of pension to another.

Martinez also contends that Section 4.19 cannot mean that one "pension 'type' is permanently applicable" because the Plan contemplates participants receiving different types of pensions at different times. Reply Br. at 13. Tellingly, however, the only example he provides of this is a disability pensioner who recovers and is later entitled to select a different type of pension—one of the two exceptions listed in Section 4.19. Finding no ambiguity in this provision, we conclude that Martinez is not entitled to convert his early retirement pension unless he fits within an exception to Section 4.19.

As a fallback argument, Martinez gives two reasons he is entitled to an adjustment under the second exception listed in Section 4.19, which provides "a Contingent Early Retirement Pension or an Early Retirement Pension may be adjusted in accordance with Section 4.16." Aple. App. 159. First, he contends that the SSA's disability determination should trigger Section 4.16(b)(i), which provides that "[u]pon determination of eligibility for a Disability Pension, the Participant shall thereafter receive the amount of a Disability Pension and be considered a Disability Pensioner." *Id.* at 158. Martinez again picks isolated language without acknowledging the context in which the language is found. Section 4.16(b)(i) addresses the adjustment made to a *contingent* early retirement

pension upon the SSA's determination of eligibility. Martinez is no longer a contingent early retirement pensioner, having already had his pension adjusted to an early retirement pension when the SSA denied his first application. Section 4.16(b)(i) has no relevance to Martinez's present ability to convert his early retirement pension to a disability pension.

His second argument is that he is entitled to a disability pension adjustment under Section 4.16(c)(ii), which provides:

> If the Participant had not applied for a Social Security Disability Award at the time of his initial application, but subsequently submits a favorable determination by the [SSA] on his eligibility for a Disability Award and otherwise meets the requirements of Section 4.12, his pension may be adjusted if the date of disability as determined in accordance with Section 9.05(b)(ii) is on or before the Effective Date of Benefits of the Initial Early Retirement Pension.

*Id.* The Trustees rejected the contention that Martinez was eligible for an adjustment under this provision because his date of disability in 2009 was not on or before the effective date of benefits of November 1, 2004. Martinez concedes that if the 2004 retirement is used, this provision cannot apply to him. Instead, he argues that there was a second effective date of benefits in 2010 corresponding to his *second retirement* in 2009 and that the Trustees erred in "mismatching" these dates. Aplt. Br. at 26. Because he had not submitted his second application for disability benefits to the SSA when he retired again in 2009 and his date of

-19-

disability preceded the purported 2010 effective date of benefits, he contends the prerequisites for an adjustment under Section 4.16(c)(ii) are met.

For this argument to have merit, Martinez must be correct that his return to disqualifying employment terminated his early retirement pension and that his return to retirement in 2009 effected a second, independent retirement with a new effective date of benefits. This argument has no support in the Plan, however. Section 9.07 addresses the precise circumstance in which a pensioner returns to work in disqualifying employment. The Plan states that "[t]he monthly benefit shall be *suspended* for any month in which the Participant is employed in Disqualifying Employment" plus an additional six-month suspension for participants under the age of 65. Aple. App. 171 (emphasis added). At the end of the disqualifying employment and the six-month suspension, the Plan provides that "[b]enefits shall be resumed." *Id.* at 172.

There is no ambiguity here. The Plan defines "suspension of benefits" as a "non-entitlement of benefits *for the month*." *Id.* (Section 9.07(c) – Definition of Suspension) (emphasis added). The common and ordinary meaning of "suspend" and "resume" as a reasonable person in the position of a Plan participant would have understood them is that Martinez's benefits would be temporarily withheld while he returned to work and the same benefits would subsequently be resumed when he again stopped working. There is no support for the contention that the Plan language is susceptible to more than one meaning, much less that such an

-20-

alternative meaning would equate a suspension of benefits with a termination of benefits.

As recounted in detail above, when Martinez made the decision to return to work, the Fund explained that his early retirement pension would be suspended and then the same benefits would be reinstated when he stopped working with adjustments to account for any difference in age and additional accrued pension credit. Notably, when Martinez left work again in 2009, he did not submit a new application for benefits, but instead submitted a *resumption* of benefits form to the Fund. The Fund then reinstated his benefits after the additional six-month suspension passed on June 1, 2010.[4] This June date is not, as Martinez contends, a new effective date of benefits, but rather the date his early retirement pension, with an effective date of benefits of November 1, 2004, was *reinstated*.[5] Because

_____

[4] Martinez contends the reinstated benefits were not the "same benefits" because he received a different monthly amount following his 2009 retirement. Section 9.07(h), titled Benefit Payments Following Suspension, explains that the amount of a participant's monthly benefit "when resumed after suspension" will be adjusted to account for increase in age or any additional accrued pension credit. Aple. App. 172–73. The Fund explained the adjustment in Martinez's early retirement benefit payments by letter in advance of the reinstatement in June 2010.

[5] Because we conclude that the 2009 date was not a new retirement but instead a resumption of his prior early retirement pension, we need not address Martinez's argument that he was permitted under the Plan to select a second effective date of benefits. Because the same pension was resumed, the effective date of benefits remained November 1, 2004. Even assuming that the Plan supports allowing Martinez to select a second effective date of benefits, Section 4.16(c)(ii) refers to the "Effective Date of Benefits of *the Initial Early Retirement*

(continued...)

-21-

his effective date of benefits was in 2004 and he did not become disabled until 2009, he is not eligible for an adjustment under Section 4.16(c)(ii).

Martinez maintains this cannot be right because the Plan defines "retirement" as being "separated from service with any and all Contributing Employers and from any and all employment that would be considered to be Disqualifying Employment." Aple. App. at 171 (Section 9.06). Martinez contends that because he was not retired during the period he returned to work, he could not also be considered an early retirement pensioner during that time. We disagree. The Plan requires that at the time a participant elects to begin receiving pension benefits he or she must be retired and must submit a written application for benefits. In 2004, when Martinez submitted his application for benefits, he was retired as defined by the Plan. The Plan then goes on to provide what happens to retired participants when they return to work. And as we have just explained, the Plan does not say that coming out of retirement terminates a previously granted pension, but instead says it is *suspended* until such point that it *resumes*.

Because neither exception to Section 4.19 applies, Martinez is not eligible to change his pension. Although this result may seem an injustice to Martinez who is now disabled, the Supreme Court has emphasized "the particular

[5](...continued)
*Pension*," Aple. App. 158 (emphasis added), and the effective date of Martinez's initial early retirement pension was November 1, 2004.

-22-

importance of enforcing plan terms as written in § 502(a)(1)(B) claims."

*Heimeshoff v. Hartford Life & Accident Ins. Co.*, 134 S. Ct. 604, 612 (2013).

"[E]mployers have large leeway to design disability and other welfare plans as

they see fit. And once a plan is established, the administrator's duty is to see that

the plan is maintained pursuant to that written instrument." *Id.* at 611–12

(internal quotations, citation, and alterations omitted).

For those reasons, the Trustees did not err in denying his conversion to a

disability pension.

### B. Equitable Estoppel

Martinez also contends the Fund is equitably estopped from denying

benefits. He asserts that his return to retirement in 2009 did entitle him to apply

for and receive a new type of pension because he detrimentally relied on Fund

correspondence indicating that he would be able to do so. Specifically, he cites

the Fund's use of the terms "re-retire" and "re-retirement" in various forms and

correspondence and the Fund's October 2009 letters that instructed, "Your

Effective Date of Benefits is established as the first of the month following

receipt of your Application for Benefits or the first of the month after you cease

working." App. 236; *see also* Aple. App. 73.

ERISA preempts state law claims, including equitable estoppel claims.

*Kerber v. Qwest Grp. Life Ins. Plan*, 647 F.3d 950, 962 (10th Cir. 2011); *see also*

*Callery v. U.S. Life Ins. Co.*, 392 F.3d 401, 407 (10th Cir. 2004). We have said

that an equitable estoppel claim may be available in the ERISA context in "egregious" circumstances, "such as where the employer lied, engaged in fraud, or intended to deceive participants, or where the claim was premised on the employer's interpretation of an ambiguous provision in the plan." *Kerber*, 647 F.3d at 962 (internal citation omitted).

Martinez alleges this case presents such egregious circumstances. To make the case, Martinez takes the Fund's instructions far from context. The terms "re-retire" and "re-retirement" only appear in the context of explaining the Plan's provisions on the suspension and resumption of benefits. The Plan never used the terms in the context of assuring participants that upon re-retirement, they are entitled to submit a new application for benefits. Moreover, as the Fund points out, the prefix "re" suggests a return to a pre-existing condition, rather than an entirely new retirement with a new type of pension benefit. Thus, aside from the fact that any reliance on these terms was unreasonable, Martinez has not identified any lie, fraud, or intent to deceive by the Fund.

The single sentence taken from the October 2009 letters is similarly unhelpful. The first form letter was sent in response to Martinez's online query in which he stated he wanted to retire, but did not mention the fact that he had previously retired and applied for benefits. The letter was sent only "to acknowledge receipt of [Martinez's] inquiry" and explained that "[d]ue to a large number of requests for information we have received, it may take us 4 to 6 weeks

to respond to [the] inquiry." App. 149. When Martinez submitted a second online query several days later, again without clarifying that he had already retired, the Fund sent an Application for Benefits and instructed that his effective date of benefits would be set after he stopped working. It is clear the letters did not provide any individualized advice, but were instead intended to provide general information until the Fund had the opportunity to look into Martinez's inquiry. And in December, after speaking with Martinez about the particulars of his situation, the Fund subsequently advised him that he would need to submit a Resumption of Benefits form and that his benefits would thereafter be reinstated.

In sum, because we have already determined the Plan language is unambiguous and the representations cited by Martinez are not the type that rise to the requisite level of egregiousness, his equitable estoppel claim fails.

## III. Conclusion

For the foregoing reasons, we AFFIRM the Fund's denial of benefits.